**Wilmer PARADISE, Petitioner–Appellant,**

v.

**CCI WARDEN, Respondent–Appellee.**

**No. 744, Docket 97–2291.**

United States Court of Appeals, Second Circuit.

Argued Nov. 24, 1997.

Decided Feb. 11, 1998.

---

Paul J. Dorsi, Law Offices of Jerome Lacobelle, West Haven, CT; Robert C. Mirto, Mirto, Ketaineck, Barrett & DiCrosta, P.C., West Haven, CT, for Petitioner–Appellant.

James A. Killen, Senior Assistant State's Attorney, Office of the Chief State's Attorney, Rocky Hill, CT, for Plaintiffs–Appellees.

Before OAKES, WALKER, Circuit Judges, and BRIEANT, District Judge.*

BRIEANT, District Judge:

Petitioner-appellant Wilmer Paradise ("Paradise") was convicted of capital felony in violation of Connecticut General Statutes ("CGS") § 53a–54b, in Connecticut Superior Court, for the kidnapping and murder of Joseph "Jay" Cunningham. On this appeal from the District Court's denial of his petition for a writ of habeas corpus, Paradise contends that: (1) the circumstances underlying his capital felony conviction give rise to an unrebuttable presumption of prosecutorial vindictiveness; (2) after initial charges against him were dismissed, his subsequent capital felony conviction should have been barred by res judicata;(3) a new trial was required as a result of the state's misrepresentations concerning its sentencing recommendation for an accomplice witness; and (4) the trial court erred in prohibiting Paradise from inquiring into unrelated charges of misconduct leveled against a physician who testified as to the cause of the victim's death. For the reasons set forth below, we affirm.

## Background

Before addressing the substantive issues raised by this appeal, we set forth the relevant factual circumstances from which the charges against Paradise arose, and the procedural history of the case. As described by the Connecticut Supreme Court, in *State v. Paradise,* 213 Conn. 388, 567 A.2d 1221

---

* Hon. Charles L. Brieant, Judge United States District Court for the Southern District of New York, sitting by designation.

(1990) (hereinafter *Paradise III* ), the following facts were established at trial.

On the evening of May 14, 1974, Paradise suggested to Mr. Brian Ellis and Mr. David Worthington that they go together looking for Jay Cunningham, who owed Paradise money in connection with a drug deal. The trio drove in a van to a shopping center in Enfield, Connecticut where they found Cunningham. After learning that Cunningham did not have the money, Paradise and Worthington grabbed him and pushed him into the van. On Paradise's instructions, Ellis pulled onto a dirt road in Enfield, where Paradise, Worthington and Cunningham got out of the van. Ellis stayed behind the wheel and watched as Worthington punched Cunningham in the face. Cunningham fell down and Worthington kicked him in the midsection. As Cunningham was struggling to get back to his feet, Paradise pulled a knife and stabbed him. Cunningham fell back down and Paradise stabbed him again. Ellis then got out of the van and approached Cunningham. Paradise told Ellis and Worthington that if either left he would tell the police that that person had killed Cunningham. Paradise then gave the knife to Worthington and demanded that he stab Cunningham, which Worthington did. Paradise made a similar demand of Ellis, who also complied. Cunningham's body was found on May 31, 1974. The then chief medical examiner of Connecticut, Dr. Elliot Gross, classified Cunningham's death as a homicide resulting from multiple stab wounds. *See Paradise III*, 567 A.2d at 1224.

More than seven years later, on December 1, 1981, Ellis was arrested on a warrant issued in connection with Cunningham's death. Paradise was arrested on the following day. By information, the state charged Paradise with the crimes of murder in violation of CGS § 53a–54a, felony murder in violation of CGS § 53a–54c, and kidnapping first degree in violation of CGS § 53a–92(a)(2) in connection with Cunningham's death.[1] All three of these charges are class A felonies under Connecticut's statutory scheme,[2] punishable by a term of imprisonment of twenty five years to life.[3]

One month after their arrest, Paradise and Ellis moved to dismiss the charges, claiming that their prosecution was barred by the five year statute of limitations in effect on May 14, 1974, CGS (Rev. to 1975) § 54–193, which provided in pertinent part:

> LIMITATION OF PROSECUTIONS FOR VARIOUS OFFENSES. No person shall be prosecuted ... for any crime or misdemeanor of which the punishment is or may be imprisonment in the Connecticut Correctional Institution, Somers, except within five years next after the offense has been committed....

On March 29, 1982, the Connecticut Superior Court granted the defendants' motion to dismiss.

The state appealed, arguing that the statute of limitations imposed by CGS § 54–193 had been amended retrospectively by Public Acts, 1976, No. 76–35, which became effective on April 6, 1976 and which provided that no statute of limitations would apply to "capital or class A" felonies. *See State v. Paradise*, 189 Conn. 346, 456 A.2d 305, 306–07 (1983) (hereinafter *Paradise I* ). The Connecticut Supreme Court rejected this argument, holding that "in a criminal case a retrospective construction of a statute should not be adopted unless its language clearly makes

---

**1.** "A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person...." *See* CGS § 53a–54a. "A person is guilty of [felony] murder when, acting either alone or with one or more persons, he commits or attempts to commit ... kidnapping ... and, in the course of and in furtherance of such crime or of flight therefrom, he, or another participant, if any, causes the death of a person other than one of the participants...." *See* CGS 53a–54c. "A person is guilty of kidnapping in the first degree when he abducts another person and: ... he restrains the person abducted with intent to (A) inflict physical injury upon him or violate or abuse him sexually; or (B) accomplish or advance the commission of a felony...." *See* CGS § 53a–92(a)(2).

**2.** *See* CGS § 53a–92(b)(kidnapping); CGS § 53a–54a(c) (murder); and *D'Amico v. Manson*, 193 Conn. 144, 476 A.2d 543, 548 n. 7 (1984) (classifying felony murder as a class A felony under the murder statute CGS § 53a–54a(c)).

**3.** CGS § 53a–35a.

such a construction necessary." 456 A.2d. at 308 (citations omitted).

Finding no language in the statute supporting such retrospective application, the court affirmed the trial court's dismissal of the murder, felony murder and kidnapping charges brought against Paradise and Ellis. In a footnote, however, the court stated:

> Because it was not raised in the court below, discussed in the brief or presented in oral argument before us, we do not decide whether this statute [of limitations], which does not specifically cover capital offenses, bars prosecution of a person for a crime for which the punishment is or may be death.

456 A.2d. at 307, n. 1. Educated by this footnote, the state re-arrested Paradise and Ellis and indicted them for intentionally causing the death of Cunningham during his kidnapping, in violation of Connecticut's capital felony statute; CGS § 53a–54b(5).[4] Capital felony is the only crime punishable by death in Connecticut. *See* CGS § 53a–35a and CGS § 53a–46a. Once again, on the defendants' motion, the trial court dismissed the indictments, and again the state appealed.

The Connecticut Supreme Court reversed the trial court's dismissal of the capital felony indictments against Paradise and Ellis holding that the prosecution of defendants on the capital felony charge was neither precluded by res judicata nor time-barred. According to the court, CGS § 54–193 was not intended to impose a time limitation on the prosecution of crimes punishable by death. *See State v. Ellis*, 197 Conn. 436, 497 A.2d 974 (1985) (hereinafter *Paradise II* ).

In the state's subsequent prosecution of Paradise on the capital felony charge, he waived a preliminary hearing to determine probable cause in return for the state's agreement not to seek the death penalty. He entered a plea of not guilty and demanded a trial by jury. On June 8, 1987, the state filed a substitute information, again charging him with the crime of capital felony in violation of CGS § 53a–54b(5), and trial began.

On July 2, 1987, the jury found Paradise guilty as charged, and on September 3, 1987, the trial court sentenced him to twenty-five years to life. *See Paradise III*, 567 A.2d at 1223–24.

Once again, Paradise appealed to the Supreme Court of Connecticut. The Connecticut Supreme Court rejected, or felt it unnecessary to reach, each of Paradise's arguments and affirmed his conviction. *Id.* at 391, 567 A.2d 1221. Paradise then filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, as it read prior to 1996, in the United States District Court for the District of Connecticut. On April 18, 1997 the District Court issued a memorandum and decision denying the petition. *Paradise v. Connecticut Correctional Institution*, No. 3890 CV 00203 (D.Conn. Apr. 18, 1997). This appeal followed.

### Discussion

#### A. Prosecutorial vindictiveness

 The Due Process Clause prohibits a defendant from being retaliated against through the imposition of a harsher sentence simply for exercising the right to appeal. In *North Carolina v. Pearce*, 395 U.S. 711, 723–26, 89 S.Ct. 2072, 2079–81, 23 L.Ed.2d 656 (1969), the Supreme Court found a due process violation where a judge, without explanation, imposed an increased sentence on a second conviction, after a defendant had challenged his first conviction successfully on appeal. In *Blackledge v. Perry*, 417 U.S. 21, 27, 94 S.Ct. 2098, 2102, 40 L.Ed.2d 628 (1974), the Court extended the *Pearce* rationale to protect defendants against prosecutorial vindictiveness, holding that due process also forbids a prosecutor from increasing the charges, or "upping the ante," against a defendant in retaliation for the assertion of a statutory right.

Both *Pearce* and *Blackledge* recognized that because the apprehension of increased punishment may deter defendants from exercising their legal rights, the appearance of

---

4. CGS § 53a–54b(5) provides that "[a] person is guilty of a capital felony who is convicted of ... murder by a kidnapper of a kidnapped person during the course of the kidnapping or before such person is able to return or be returned to safety...."

vindictiveness must also be avoided. *Pearce,* 395 U.S. at 725, 89 S.Ct. at 2080; *Blackledge,* 417 U.S. at 28, 94 S.Ct. at 2102–03; *see United States v. King,* 126 F.3d 394, 397 (2d Cir.1997). In *United States v. Goodwin,* 457 U.S. 368, 373, 102 S.Ct. 2485, 2488–89, 73 L.Ed.2d 74 (1982), the Supreme Court explained that the need to insulate defendants from the apprehension of vindictiveness may justify a rebuttable presumption of vindictiveness, applied when, but only when, the circumstances of a case pose a "realistic likelihood" of such vindictiveness. *See King,* 126 F.3d at 397.

Paradise does not argue that the prosecution was motivated by actual retaliatory intent. Instead, he contends that the state's decision to charge him in *Paradise III* with capital felony, a death penalty crime, for the same acts for which he had faced only incarceration under the charges filed in *Paradise I,* gave rise to an unrebuttable presumption of prosecutorial vindictiveness.

We disagree. Our inquiry starts with an assumption, favorable to Paradise, that the fact that the death penalty was not ultimately sought in *Paradise III* does not mean that he was not threatened with greater punishment.[5] Because the maximum period of incarceration facing petitioner in *Paradise III* was actually less than what he faced in *Paradise I,* the state contends that petitioner was never actually threatened with greater punishment, and that therefore no presumption of vindictiveness can apply.

It is true that in the mistrial context this court has held that "a threat of greater punishment is required to justify a 'realistic' apprehension of retaliatory motive on the part of the prosecution," *Lane v. Lord,* 815 F.2d 876, 879 (2d Cir.1987). In this case, however, we assume for our analysis that petitioner was threatened with the death penalty in *Paradise III,* undoubtedly a qualitatively greater punishment than that threatened by the original charges.[6]

Regardless of whether petitioner was threatened with greater punishment, no realistic likelihood of prosecutorial vindictiveness arises from the "the 'totality of the objective circumstances' " of this case. *King,* 126 F.3d at 398 (quoting *United States v. Contreras,* 108 F.3d 1255, 1263 (10th Cir.1997)).

At a threshold level, the conduct Paradise offers as a predicate for the state's purported retaliation is his successful pretrial motion to dismiss in *Paradise I.* Based on the *Goodwin* Court's recognition of the contrasting institutional considerations confronting prosecutors in pretrial and post-trial settings, 457 U.S. at 381–82, 102 S.Ct. at 2492, this court has consistently adhered to the principle that the " 'presumption of prosecutorial vindictiveness does not exist in a pretrial setting.' " *United States v. White,* 972 F.2d 16, 19 (2d Cir.1992)(quoting *United States v. Hinton,* 703 F.2d 672, 678 (2d Cir.1983)).

Paradise insists that application of that principle to this case would be inappropriate, because his successful motion to dismiss went to the very ability of the state to bring its choice of charges. Yet, "[d]efense counsel routinely file pretrial motions to . . . plead an affirmative defense. . . ." *Goodwin,* 457 U.S. at 381, 102 S.Ct. at 2493. "It is unrealistic to assume that a prosecutor's probable response to such motions is to seek to penalize and to deter." *Id.*

In essence, Paradise's contention is that by charging him with a crime punishable by death in *Paradise III* the state "upped the ante" against him in retaliation for his suc-

---

5. There is no indication in the record that Connecticut, a state where nobody has been executed since 1976 when the validity of the death penalty was reaffirmed by the Supreme Court in *Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), actually would ever have tried to dispatch Paradise to that other world for which he is named.

6. In making this assumption, we leave open the question of what significance to assign to the fact that the state agreed not to seek the death penalty in return for petitioner's waiver of his right to a probable cause hearing. It could be argued that the process by which the state's agreement in this regard was secured is analogous to the "give and take" of plea negotiations. In that context, the Supreme Court has held that it is permissible for a prosecutor to threaten a defendant with additional charges should he refuse to plead, so long as the defendant is "free to accept or reject the prosecution's offer." *Bordenkircher v. Hayes,* 434 U.S. 357, 363, 98 S.Ct. 663, 668, 54 L.Ed.2d 604 (1978).

cessful invocation of the statute of limitations defense in *Paradise I*. This is not a valid analysis. Only a charge punishable by death would not have been time-barred by CGS § 54–193. *Paradise II, supra,* 497 A.2d at 977–87. Thus, the state could proceed on a death penalty charge, or not at all.[7]

Paradise's displeasure that the state chose to punish him does not automatically confer upon him a constitutional ground to void his conviction. "The imposition of punishment is the very purpose of virtually all criminal proceedings." *Goodwin,* 457 U.S. at 372–73, 102 S.Ct. at 2488. A state's punitive motivation does not represent a constitutional violation, where as here, the state sought to punish not for the right exercised, but for the crime committed.

As a final matter on this issue, we address Paradise's contention that the state could have proceeded on the capital felony charge in the first place, but chose not to do so, and that somehow that choice amounts to a constitutional violation. Accepting this contention would encourage prosecutors to overcharge defendants, by charging both a greater number of crimes and the most severe crimes supported by the evidence. This is "a result we do not wish to promote." *King,* 126 F.3d at 399. Instead, "the validity of a pretrial charging decision must be measured against the broad discretion held by the prosecutor to select the charges against the accused." *Goodwin,* 457 U.S. at 380, n. 11, 102 S.Ct. at 2492, n. 11; *see White, supra,* 972 F.2d at 19. In its initial charging decision, the prosecutor had broad discretion, and had the right to consider that capital prosecutions are complex and dilatory, place a tremendous demand on prosecutorial and judicial resources, and are unlikely at least in Connecticut, to eventuate in the death of the accused. *See Goodwin,* 457 U.S. at 382, 102 S.Ct. at 2493; *White,* 972 F.2d at 18.

In sum, we hold that the capital felony charge brought in *Paradise III* was not a function of prosecutorial vindictiveness, nor does it give rise to a realistic likelihood of such vindictiveness; it was simply the only charge available, after the other charges had been dismissed in *Paradise I* as time barred.

## B. Issue Preclusion

■ Relying on *United States v. Oppenheimer,* 242 U.S. 85, 37 S.Ct. 68, 61 L.Ed. 161 (1916) appellant argues that "res judicata bars the prosecution ... of Paradise after the initial charges against him were dismissed." Appellant's Brief at 33. In *Oppenheimer,* the defendant moved to quash an indictment against him on the grounds that a former indictment for the same offense had been determined to be barred by a statue of limitations. In a later unrelated case, that determination was held to be erroneous. The government then sought to recharge the defendant with the identical crimes that had originally been dismissed. Without expressly invoking any constitutional basis, Justice Holmes held that res judicata should be applied to bar this second prosecution for the same offense in order to comply "with what in the civil law is a fundamental principle of justice." *Oppenheimer,* 242 U.S. at 88, 37 S.Ct. at 69.

■ There can be no double jeopardy issue, where, as here, the initial prosecution was decided on a pretrial motion. *See United States v. Martin Linen Supply Co.,* 430 U.S. 564, 97 S.Ct. 1349, 51 L.Ed.2d 642 (1977). Nevertheless, relying on this court's

7. The circumstances underlying the state's discovery that it could proceed on the capital felony charge, after the *Paradise I* dismissal, confirm the absence of a "realistic likelihood of vindictiveness" in this case. In an earlier proceeding, the former assistant state's attorney initially responsible for prosecuting Paradise testified that it was the footnote, *see supra,* in the Connecticut Supreme Court's opinion dismissing the original charges against Paradise that *"gave us a clue* that the statute had not run for capital felonies." This statement reveals that at worst the state proceeded against Paradise in a somewhat mud-dled fashion. We should not allow the doctrine of prosecutorial vindictiveness to be invoked—as Paradise seeks to do here—to require application of some hypothetical presumption of prosecutorial infallibility, and to require the release of a guilty defendant every time a prosecutor stumbles into an inadvertent pleading error. As *Goodwin* made clear, a prosecutor need not be "infallible" to avoid application of the presumption—such an approach "would ignore the practical restraints imposed by often limited prosecutorial resources." 457 U.S. at 382, n. 14, 102 S.Ct. at 2493, n. 14.

recognition of due process "overtones" in Justice Holmes' *Oppenheimer* opinion, *see United States ex rel DiGiangiemo v. Regan,* 528 F.2d 1262, 1266 (2d Cir.1975), Paradise contends that the due process clause requires that we apply "res judicata" to nullify his conviction.

Paradise's arguments on this point are somewhat unclear. We will presume that in seeking "res judicata," Paradise seeks issue preclusion. We do not accept Paradise's suggestion that there can be no distinction between the issue preclusion and claim preclusion elements of res judicata in the circumstances of this case. That suggestion is predicated on Paradise's self-serving assumption that the issue determined in *Paradise I* was that of guilt or innocence. It was not.

It is true that in *DiGiangiemo,* Judge Friendly stated that due process could—without the aid of the double jeopardy clause—require a state to apply issue preclusion in favor of a criminal defendant. 528 F.2d at 1265. Appellant in *DiGiangiemo* sought to suppress certain evidence on the ground that its introduction was barred by a prior proceeding at which he had successfully moved to suppress other evidence obtained through the same illegal search. Although he rejected appellant's contention for other reasons, *see* 528 F.2d at 1267–70, Judge Friendly suggested that due process provides at least some issue preclusion protection in criminal cases:

> Assuming that the state has had an opportunity for a full hearing on suppression and at least one appeal as of right, we think due process would forbid relitigation of the issue determined adversely to it, although not, of course, the prosecution ... on the basis of other evidence. .

*Id.* at 1266.

Applying *DiGiangiemo* and *Oppenheimer* to this case, we hold that due process would of course have prohibited the state from attempting to relitigate the issue of whether the original charges of murder, felony murder and kidnapping were time-barred. However, the state did not seek to relitigate the statute of limitations issue. Instead, in *Paradise III* the state had its first opportunity to litigate the issue of Paradise's guilt for or innocence of the murder of Jay Cunningham. There can be no issue preclusion in this case.

## C. Prosecutorial misrepresentation

■ Petitioner argues that the state misrepresented the nature of the understanding it had with his co-defendant and the state's key witness, Brian Ellis, to the jury, based on the following exchange between Ellis and the prosecutor:

Q. Do you have an understanding as to whether or not the State will make any recommendation with respect to your sentence?

A. I hope so.

Q. And what is your understanding, Sir?

A. That if I testify, I can get a lower sentence.

Q. And what is the recommended sentence? What will the State recommend for you?

A. Hopefully something lower than the sentence that I'm getting.

Q. Which sentence are you going to get, Sir?

A. Seven to 14 years.

Q. The sentence of not less than seven or more than 14 years?

A. Yes

. . .

Q. And can you tell us why you're testifying here today?

A. So that I hope that I do get a lesser sentence.

Q. Now do you understand that the State is going to recommend a sentence of seven to 14 years?

A. Yes.

Q. And your attorney has the right to argue for a lesser sentence, is that right?

A. Yes.

Q. And do you understand that the State's recommendation is seven to 14 years, regardless of whether you testify today? You understand that, Sir?

A. Yes, Your Honor; I mean, yes.

Petitioner points to the fact that on the prosecutor's later recommendation, the sentencing court actually sentenced Ellis to a sentence of four and one-half to nine years. Pointing to the above exchange, petitioner claims that the prosecutor improperly led the jury to believe that regardless of Mr. Ellis' testimony the prosecutor would not recommend a further reduced sentence—in effect that the deal was already done—when in fact at the time of Mr. Ellis' sentencing the prosecutor did exactly that. According to petitioner, the prosecutor's alleged misrepresentations in this regard denied him his Fourteenth Amendment right to a fair trial, because the jury was instructed to infer that nothing was motivating Ellis' testimony except his heartfelt desire to tell the truth.

We disagree. It is well established that under *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), and *Napue v. Illinois,* 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959), prosecutors are obligated to correct any misconceptions arising from a situation where a government witness falsely denies having struck a bargain with the state, or substantially misrepresents the nature of the bargain. A new trial, however, is only "required if 'the false testimony could ... in any reasonable likelihood have affected the judgment of the jury ....' " *Giglio,* 405 U.S. at 154, 92 S.Ct. at 766 (quoting *Napue,* 360 U.S. at 271, 79 S.Ct. at 1178).

Applying these principles, it is true that the prosecutor's presentation of the inducement offered to Mr. Ellis—as it was ultimately delivered—may not have been as clear as it could have been. That is not dispositive, however. The question here is one of "materiality." *Giglio,* 405 U.S. at 154, 92 S.Ct. at 766. As the various exchanges recited above, together with the record as a whole, demonstrate, the jury was well informed that Mr. Ellis' testimony flowed from his desire to fulfill his end of the bargain struck with the prosecution. Any further impeachment of Mr. Ellis' credibility which might have resulted from attempts to make difficult, if not impossible, prospective disclosure of what ultimately proved to be the prosecutor's persuasive efforts on his behalf would simply not have been material. We

agree with the district court that there was no reasonable likelihood that the inartful disclosure of the precise nature of the inducement ultimately offered to Mr. Ellis would have affected the judgment of the jury.

## D. The Sixth Amendment

■ Finally, Paradise alleges a Sixth Amendment violation, arising from the trial court's refusal to allow him to cross-examine a physician concerning charges of unrelated official misconduct that had been brought against him. At trial, the state called a Dr. Elliot Gross to testify as to the victim's cause of death. Dr. Gross had been the chief medical examiner of Connecticut at the time of Cunningham's murder. At the time of trial, he was the chief medical examiner of New York City.

During his cross-examination, Paradise's counsel attempted to ask Dr. Gross about an investigation Mayor Koch and the Governor of New York conducted regarding the New York City medical examiner's office. The state objected, and the jury was excused. The defendant explained that he wanted to inquire into the investigation for impeachment purposes to challenge Gross' opinion as an expert. The trial court refused to permit such cross-examination. *See Paradise III,* 567 A.2d at 1229.

Paradise contends that this decision constitutes reversible error. Again, we disagree. The Sixth Amendment guarantees the right of an accused to be confronted with the witnesses against him. U.S. Const., amend. VI. Nevertheless, "trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Delaware v. Van Arsdall,* 475 U.S. 673, 679, 106 S.Ct. 1431, 1435, 89 L.Ed.2d 674 (1986).

The trial court properly limited cross-examination of Dr. Gross. He had been exonerated of the charges that had been brought against him. Inquiry into those charges would have served only to create confusion in

an area of marginal relevance. At trial, Dr. Gross testified to his hardly astonishing conclusion that the victim's death was the result of multiple stab wounds to the trunk. There was other evidence to this same effect, and no evidence that Cunningham was hit by a bolt of lightning.[8] Even assuming that cross-examination was curtailed erroneously, any error was harmless. The trial court was within its discretion in limiting Paradise's cross-examination of Dr. Gross.

The judgment of the district court is affirmed.

---

**8.** In fact, four other witnesses testified about the cause of the victim's death.