UNITED STATES OF AMERICA

v.

Ahmed Abdel SATTAR, a/k/a "Abu Omar," a/k/a "Dr. Ahmed," Lynne Stewart, and Mohammed Yousry, Defendants.

No. S1 02 395JGK.

United States District Court, S.D. New York.

April 20, 2004.

David N. Kelley, U.S. Atty., Robin L. Baker, Christopher Jude Morvillo, Anthony S. Barkow, and Andrew S. Dember, Asst. U.S. Attys., U.S. Atty's Office, New York, NY, for U.S.

Barry M. Fallick, Kenneth Paul, Jillian S. Harrington, Paul Knepper, Trisha La-Fache, Rochman Platzer Fallick & Sternheim, LLP, New York, NY, for defendant Sattar.

Michael E. Tigar, and Steven P. Ragland, The Tigar Law Firm, Annapolis, MD, Jill R. Shellow-Lavine, Law Offices of Jill R. Shellow-Lavine, Southport, CT, for defendant Stewart.

David Stern, Rothman, Schneider, Soloway & Stern, P.C., New York, NY, David Ruhnke, Ruhnke & Barrett, for defendant Yousry.

## OPINION and ORDER

KOELTL, District Judge.

The defendants—Ahmed Abdel Sattar ("Sattar"), Lynne Stewart ("Stewart"), and Mohammed Yousry ("Yousry")—were charged in a seven-count superseding in-

dictment ("S1 Indictment") filed on November 19, 2003. Count One of the S1 Indictment charges Sattar, Stewart, and Yousry with conspiring to defraud the United States in violation of 18 U.S.C. § 371. Count Two charges Sattar with conspiring to murder and kidnap persons in a foreign country in violation of 18 U.S.C. §§ 956(a)(1) and (a)(2)(A). Count Three charges Sattar with soliciting persons to engage in crimes of violence in violation of 18 U.S.C. § 373. Count Four charges Stewart and Yousry with conspiring, in violation of 18 U.S.C. § 371, to provide and conceal material support to be used in preparation for, and in carrying out, the conspiracy alleged in Count Two. Count Five charges Stewart and Yousry with a substantive count of providing and concealing material support to the Count Two conspiracy, in violation of 18 U.S.C. §§ 2339A and 2. Counts Six and Seven charge Stewart with making false statements in violation 18 U.S.C. § 1001.

The S1 Indictment supersedes a five-count indictment filed on April 8, 2002 ("original indictment"). Count One of the original indictment charged Sattar, Stewart, Yousry, and Yassir Al–Sirri, a defendant not charged in the S1 Indictment, with conspiring to provide material support and resources to a foreign terrorist organization ("FTO") in violation of 18 U.S.C. § 2339B. Count Two charged the same defendants with providing and attempting to provide material support and resources to an FTO in violation of 18 U.S.C. §§ 2339B and 2. Count Three charged Sattar and Al–Sirri with soliciting persons to engage in crimes of violence in violation of 18 U.S.C. § 373. Count Four charged Sattar, Stewart, and Yousry with conspiring to defraud the United States in violation of 18 U.S.C. § 371. And Count Five charged Stewart with making false statements in violation of 18 U.S.C. §§ 1001 and 2. *United States v. Sattar*, 272 F.Supp.2d 348, 352–53 (S.D.N.Y.2003).

Sattar, Stewart, and Yousry moved to dismiss the original indictment on various grounds. The defendants argued, among other things, that Counts One and Two were unconstitutionally vague as applied to the conduct alleged against them in the original indictment. Counts One and Two charged the defendants with conspiring to provide, and providing, material support and resources to the Islamic Group, an organization led by Sheikh Abdel Rahman that had been designated an FTO by the Secretary of State.[1] Section 2339B of Title 18 incorporates the definition of "material support or resources" from § 2339A, and the definition includes, among other things, "personnel" and "communications equipment." *Sattar*, 272 F.Supp.2d at 356. In an Opinion and Order dated July 22, 2003, the Court granted the defendants' motion to dismiss Counts One and Two of the original indictment as void for vagueness as applied to the allegations in the original indictment, where the defendants were alleged in part to have "provided" material support by providing themselves as "personnel" and to have provided "communications equipment" by using their own telephones. *Sattar*, 272 F.Supp.2d at 357–61.

The Government filed the S1 Indictment on November 19, 2003. Sattar and Stewart now move to dismiss the S1 Indictment on numerous grounds.[2] They also move

---

**1.** The Islamic Group had been designated an FTO by the Secretary of State pursuant to 8 U.S.C. § 1189. *Sattar*, 272 F.Supp.2d at 353.

**2.** Yousry joins all motions by Sattar and Stewart that are "applicable" to him. Sattar joins in any motions by co-defendants. Stewart joins Sattar's application for pretrial access to Mohammed Abdel Rahman and to compel his testimony.

for a bill of particulars and various other relief.

## I

## A

The S1 Indictment alleges the following facts. From at least the early 1990's until in or about April 2002, Omar Ahmad Ali Abdel Rahman, a/k/a "the Sheikh," a/k/a "Sheikh Omar" ("Sheikh Abdel Rahman"), an unindicted alleged co-conspirator in Counts One and Two, was an influential and high-ranking member of terrorist organizations based in Egypt and elsewhere. (S1 Ind. ¶ 1.) Sheikh Abdel Rahman allegedly considered nations, governments, institutions, and individuals that did not share his radical interpretation of Islamic law to be "infidels" and interpreted the concept of "jihad" to compel the waging of opposition against such infidels by whatever means necessary, including force and violence. (S1 Ind. ¶ 1.) The S1 Indictment alleges that Sheikh Abdel Rahman stated publicly in 1990 that "jihad is jihad ... there is no such thing as commerce, industry and science in jihad. This is calling things ... other than by its own names. If God ... says do jihad, it means do jihad with the sword, with the cannon, with the grenades and with the missile; this is jihad. Jihad against God's enemies for God's cause and His word." (S1 Ind. ¶ 2.)

Sheikh Abdel Rahman allegedly supported and advocated jihad to, among other things: (1) overthrow the Egyptian government and replace it with an Islamic state; (2) destroy the nation of Israel and give the land to the Palestinians; and (3) oppose those governments, nations, institutions, and individuals, including the United States and its citizens, whom he perceived as enemies of Islam and supporters of Egypt and Israel. (S1 Ind. ¶ 3.)

Sheikh Abdel Rahman allegedly endorsed terrorism to accomplish his goals. The S1 Indictment alleges that Sheikh Abdel Rahman stated in a speech given prior to May 2, 1994:

> Why do we fear the word "terrorist"? If the terrorist is the person who defends his right, so we are terrorists. And if the terrorist is the one who struggles for the sake of God, then we are terrorists. We ... have been ordered with terrorism because we must prepare what power we can to terrorize the enemy of God and yours. The Quran [the Islamic holy book] mentioned the word "to strike terror," therefore we don't fear to be described with "terrorism".... They may say "he is a terrorist, he uses violence, he uses force." Let them say that. We are ordered to prepare whatever we can of power to terrorize the enemies of Islam.

(S1 Ind. ¶ 4.) Sheikh Abdel Rahman allegedly exercised leadership while subordinates carried out the details of specific terrorist operations. (S1 Ind. ¶ 5.) He was allegedly viewed by his followers and associates as a religious scholar, and he allegedly provided necessary guidance regarding whether particular terrorist activities were permissible or forbidden under his extremist interpretation of Islamic law, and at times provided strategic advice concerning whether such activities would be an effective means of achieving their goals. (S1 Ind. ¶ 5.) The S1 Indictment alleges that Sheikh Abdel Rahman also solicited persons to commit violent terrorist actions, and that he served as a mediator of disputes among his followers and associates. (S1 Ind. ¶ 5).

On or about July 2, 1993, Sheikh Abdel Rahman was arrested in the United States. (S1 Ind. ¶ 6.) In October 1995, Sheikh Abdel Rahman was convicted of engaging in a seditious conspiracy to wage a war of urban terrorism against the United States, including the 1993 World Trade Center bombing and a plot to bomb other

New York City landmarks. (S1 Ind. ¶ 6.) He was also found guilty of soliciting crimes of violence against the United States military and Egyptian president Hosni Mubarak. (S1 Ind. ¶ 6.) In 1996 Sheikh Abdel Rahman was sentenced to life imprisonment. (S1 Ind. ¶ 6.) His conviction was affirmed on appeal, and became final on January 10, 2000 when the United States Supreme Court refused to hear his case. (S1 Ind. ¶ 6.)

The S1 Indictment alleges that both prior to and after his arrest and imprisonment, Sheikh Abdel Rahman was a spiritual leader of an international terrorist group based in Egypt and known as the Islamic Group, a/k/a "Gama'a al-Islamiyya," a/k/a "IG," a/k/a "al-Gama'at," a/k/a "Islamic Gama'at," a/k/a "Egyptian al-Gama'at al-Islamiyya" ("Islamic Group"). (S1 Ind. ¶ 8.) Sheikh Abdel Rahman allegedly played a key role in defining and articulating the goals, policies, and tactics of the Islamic Group. (S1 Ind. ¶ 8.)

Since in or about 1997, Sheikh Abdel Rahman has been incarcerated in various facilities operated by the United States Bureau of Prisons, including the Federal Medical Center in Rochester, Minnesota. (S1 Ind. ¶ 6.) The S1 Indictment alleges that, following his arrest, Sheikh Abdel Rahman urged his followers to wage jihad to obtain his release from custody. (S1 Ind. ¶ 7.) Sheikh Abdel Rahman's followers, including those associated with the Islamic Group, allegedly shared his views about the reasons for jihad, including the goal of obtaining Sheikh Abdel Rahman's release from United States custody. (S1 Ind. ¶ 10.)

The S1 Indictment charges that, after Sheikh Abdel Rahman's arrest, a coalition of alleged terrorists, supporters, and followers, including leaders and associates of the Islamic Group, al Qaeda, the Egyptian Islamic Jihad, and the Abu Sayyaf terrorist group in the Philippines threatened and committed acts of terrorism directed at obtaining the release of Sheikh Abdel Rahman from prison. (S1 Ind. ¶ 11.) The Islamic Group allegedly released, in response to the sentence of life imprisonment imposed on Sheikh Abdel Rahman, a statement that warned: "All American interests will be legitimate targets for our struggle until the release of Sheikh Omar Abdel Rahman and his brothers. As the American Government has opted for open confrontation with the Islamic movement and the Islamic symbols of struggle, [the Islamic Group] swears by God to its irreversible vow to take an eye for any eye." (S1 Ind. ¶ 13.) The Islamic Group allegedly issued other statements threatening various reprisals if the United States failed to release Sheikh Abdel Rahman from custody. (S1 Ind. ¶¶ 14–16.)

On or about November 17, 1997, six assassins shot and stabbed a group of tourists visiting an archaeological site in Luxor, Egypt, killing fifty-eight foreign tourists and four Egyptians. (S1 Ind. ¶ 17.) The S1 Indictment charges that, before making their exit, the assassins scattered leaflets espousing their support for the Islamic Group and calling for release of Sheikh Abdel Rahman, and inserted one of the leaflets into one victim's slit torso. (S1 Ind. ¶ 17.) Following this attack, the Islamic Group allegedly issued a statement that blamed the high number of fatalities on Egyptian government security forces, and warned that the Islamic Group would "continue its military operations as long as the regime does not respond to our demands," which included "the establishment of God's law, cutting relations with the Zionist entity (Israel) . . . and the return of our sheik[h] and emir to his land." (S1 Ind. ¶ 18.)

The S1 Indictment alleges that, on or about October 13, 1999, a statement issued in the name of Islamic Group leader Rifa'i

Ahmad Taha Musa, a/k/a "Abu Yasir" ("Taha"), an unindicted alleged co-conspirator in Counts One and Two, vowed to rescue Sheikh Abdel Rahman and that the United States' "hostile strategy to the Islamic movement" would drive it to "unify its efforts to confront America's piracy." (S1 Ind. ¶ 19.) The S1 Indictment also alleges that, in or about March 2000, individuals claiming association with the Abu Sayyaf terrorist group kidnapped approximately 29 hostages in the Philippines, demanded the release from prison of Sheikh Abdel Rahman and two other convicted terrorists in exchange for the release of the hostages, and threatened to behead hostages if their demands were not met. (S1 Ind. ¶ 20.) Philippine authorities allegedly later found two decomposed, beheaded bodies in an area where the hostages had been held, and four hostages were unaccounted for. (S1 Ind. ¶ 20.) The S1 Indictment further charges that on or about September 21, 2000, an Arabic television station, Al Jazeera, televised a meeting of Taha, Usama Bin Laden (leader of the al Qaeda terrorist organization), and Ayman Al–Zawahiri (former leader of the Egyptian Islamic Jihad organization and one of Bin Laden's top lieutenants). (S1 Ind. ¶ 21.) Sitting under a banner that read, "Convention to Support Honorable Omar Abdel Rahman," the three alleged terrorist leaders allegedly pledged jihad to free Sheikh Abdel Rahman from incarceration in the United States. (S1 Ind. ¶ 21.) The S1 Indictment charges that during that meeting, Mohammed Abdel Rahman, a/k/a "Asadallah," who is a son of Sheikh Abdel Rahman, was heard encouraging others to "avenge your Sheikh" and "go to the spilling of blood." (S1 Ind. ¶ 21.)

The S1 Indictment charges that at various times starting in or about July 1997, certain Islamic Group leaders and factions called for an "initiative," or cease-fire, in which the Islamic Group would suspend terrorist operations in Egypt in a tactical effort to persuade the Egyptian government to release Islamic Group leaders, members, and associates who were in prison in Egypt. (S1 Ind. ¶ 22.) The S1 Indictment further charges that, in or about February 1998, Usama Bin Laden and Taha, among others, issued a fatwah, a legal ruling issued by an Islamic scholar, that stated, among other things, "We in the name of God, call on every Muslim who believes in God and desires to be rewarded, to follow God's order and kill Americans and plunder their wealth wherever and whenever they find it." (S1 Ind. ¶ 23.) On or about October 12, 2000, in Aden Harbor, Yemen, the S1 Indictment charges, two alleged terrorists piloted a bomb-laden boat alongside the United States Navy vessel the U.S.S. Cole and detonated a bomb that ripped a hole in the side of the U.S.S. Cole approximately forty feet in diameter, killing seventeen crew members and wounding at least forty other crew members. (S1 Ind. ¶ 24.)

The S1 Indictment alleges that, beginning in or about April 1997, United States authorities, in order to protect the national security, limited certain of Sheikh Abdel Rahman's privileges in prison, including his access to the mail, the media, the telephone, and visitors. (S1 Ind. ¶ 25.) At that time, the Bureau of Prisons, at the direction of the Attorney General, imposed Special Administrative Measures ("SAMs") upon Sheikh Abdel Rahman. (S1 Ind. ¶ 25.) The alleged purpose of the SAMs was to protect "persons against the risk of death or serious bodily injury" that could result if Sheikh Abdel Rahman were free "to communicate (send or receive) terrorist information." (S1 Ind. ¶ 25.) Under the SAMs, Sheikh Abdel Rahman was permitted to call and receive visits only from his immediate family members or his attorneys and their translator. (S1 Ind. ¶ 25.) The SAMs prohibited communication with any member or representative of the news

media, and they required all of Sheikh Abdel Rahman's mail to be screened by federal authorities. (S1 Ind. ¶ 25.) The SAMs specifically provided that Sheikh Abdel Rahman's attorneys, before being allowed access to Sheikh Abdel Rahman, were obliged to sign an affirmation acknowledging that that they and their staff would abide fully by the SAMs. (S1 Ind. ¶ 26.) The attorneys agreed in the affirmations, among other things, to "only be accompanied by translators for the purpose of communicating with inmate Abdel Rahman concerning legal matters." (S1 Ind. ¶ 26.) Since at least in or about May 1998, the attorneys also agreed not to use "meetings, correspondence, or phone calls with Abdel Rahman to pass messages between third parties (including, but not limited to, the media) and Abdel Rahman." (S1 Ind. ¶ 26.)

Stewart was one of Sheikh Abdel Rahman's attorneys during his 1995 criminal trial and continued to act as one of his attorneys following his conviction. (S1 Ind. ¶ 27.) Yousry testified as a defense witness at Sheikh Abdel Rahman's 1995 criminal trial and, starting in or about 1997, acted as an Arabic interpreter for communications between Sheikh Abdel Rahman and his attorneys. (S1 Ind. ¶ 27.) The S1 Indictment charges that Sattar is a longtime associate of and surrogate for Sheikh Abdel Rahman. (S1 Ind. ¶ 27.) The S1 Indictment alleges that, following Sheikh Abdel Rahman's arrest, conviction, sentence, and the imposition of the SAMs, Sattar coordinated efforts to keep Sheikh Abdel Rahman in contact with his co-conspirators and followers. (S1 Ind. ¶ 27.) It also alleges that Stewart, through her continued access to Sheikh Abdel Rahman, enabled him to remain in contact with his co-conspirators and followers. (S1 Ind. ¶ 27.) And it alleges that Yousry, through his continued access to Sheikh Abdel Rahman and facilitated by Stewart, enabled Sheikh Abdel Rahman to remain in contact with his co-conspirators and followers. (S1 Ind. ¶ 27.)

## B

Count One of the S1 Indictment alleges that, from in or about June 1997 through in or about April 2002, defendants Sattar, Stewart, and Yousry, as well as Sheikh Abdel Rahman and Taha, together with others known and unknown, in violation of 18 U.S.C. § 371, conspired to defraud the United States by obstructing the Department of Justice and the Bureau of Prisons in the administration and enforcement of the SAMs imposed on Sheikh Abdel Rahman. (S1 Ind. ¶ 29.) The S1 Indictment alleges a series of overt acts committed in furtherance of the alleged conspiracy. (S1 Ind. ¶¶ 30a–30ii.) For example, the S1 Indictment charges that, following a March 1999 prison visit to Sheikh Abdel Rahman by Stewart and Yousry, Sattar disseminated to an unnamed Islamic Group leader, a statement issued by Sheikh Abdel Rahman and directed to Islamic Group leader Taha, a statement that instructed Taha to adhere to the initiative and to make no changes without consulting or informing Sheikh Abdel Rahman. (S1 Ind. ¶ 30c.) The S1 Indictment also charges that, following a September 1999 prison visit to Sheikh Abdel Rahman by Yousry and one of Sheikh Abdel Rahman's attorneys other than Stewart, Sattar told Taha that Sheikh Abdel Rahman had issued a statement from jail calling for an end to the initiative in response to reports that a raid by Egyptian law enforcement officials that month had resulted in the deaths of four members of the Islamic Group. (S1 Ind. ¶ 30e.)

On or about May 16, 2000, Stewart signed an affirmation in which she agreed to abide by the terms of the SAMs then in effect on Sheikh Abdel Rahman. (S1 Ind. ¶ 30i.) The S1 Indictment alleges that

during a May 2000 prison visit to Sheikh Abdel Rahman by Stewart and Yousry, Yousry told Sheikh Abdel Rahman and Stewart about the kidnappings by the Abu Sayyaf terrorist group in the Philippines and the group's demand to free Sheikh Abdel Rahman. (S1 Ind. ¶ 30j.) Stewart allegedly responded, "Good for them." (S1 Ind. ¶ 30j.) During the same prison visit, Yousry allegedly read Sheikh Abdel Rahman an inflammatory statement by Taha that had recently been published in an Egyptian newspaper. (S1 Ind. ¶ 30k.) Yousry also allegedly read to Sheikh Abdel Rahman, at Stewart's urging, a letter from Sattar. (S1 Ind. ¶ 30l.) Sattar's letter allegedly sought Sheikh Abdel Rahman's comments on Sattar's communications with certain Islamic Group leaders, and it also allegedly sought Sheikh Abdel Rahman's endorsement of "the formation of a team that calls for cancellation of the peace initiative or makes threats or escalates things." (S1 Ind. ¶ 30l.)

The S1 Indictment alleges that while Yousry read Taha's statement and Sattar's letter to Sheikh Abdel Rahman, Stewart actively concealed that fact from the prison guards, in part by instructing Yousry to make it look as if Stewart were communicating with Sheikh Abdel Rahman and Yousry were merely translating, by having Yousry look periodically at Stewart and Sheikh Abdel Rahman in turn, and by pretending to be participating in the conversation with Sheikh Abdel Rahman by making extraneous comments like "chocolate" and "heart attack." (S1 Ind. ¶ 30m.) Stewart allegedly observed to Yousry that she could "get an award for" her acts, and Yousry allegedly agreed that Stewart should "get an award in acting." (*Id.*) On the second day of the May 2000 prison visit, Stewart again allegedly actively concealed the conversation between Yousry and Sheikh Abdel Rahman in which Sheikh Abdel Rahman dictated letters to Yousry about the cease-fire. (S1 Ind. ¶ 30*o*.)

Following the May 2000 prison visit, Sattar is alleged to have had telephone conversations with Islamic Group leaders in which he stated that Sheikh Abdel Rahman did not object to a return to "work" (which the S1 Indictment describes as "terrorist operations"), that Sheikh Abdel Rahman agreed that the Islamic Group should escalate the issues in the media, that he advised the Islamic Group to avoid division in its leadership, and that he instructed the Islamic Group to hint at a military operation even if the Islamic Group was not ready for military action. (S1 Ind. ¶ 30p.) The S1 Indictment also alleges that on or about June 14, 2000, Stewart released a statement to the press that quoted Sheikh Abdel Rahman as stating that he "is withdrawing his support for the cease-fire that currently exists." (S1 Ind. ¶ 30r.) The S1 Indictment further alleges that on or about June 20, 2002, Sattar advised Mohammed Abdel Rahman by telephone that Sheikh Abdel Rahman had had a conference call with some of his attorneys that morning and that Sheikh Abdel Rahman had issued a new statement clarifying that he was not unilaterally ending the initiative, but rather was withdrawing his support and stated that it was up to the "brothers" in the Islamic Group to reconsider the issue. (S1 Ind. ¶ 30v.)

The S1 Indictment also alleges that in October 2000, Taha and Sattar discussed a fatwah that Taha had written under Sheikh Abdel Rahman's name in response to recent events in the Middle East, and that Sattar made revisions to the fatwah. (S1 Ind. ¶ 30w.) Sattar allegedly thereafter called Yassir Al–Sirri, an unindicted alleged co-conspirator, and read to him the fatwah to be issued under Sheikh Abdel Rahman's name entitled "Fatwah Mandating the Killing of Israelis Everywhere," which Al–Sirri agreed to revise and disseminate, and which subsequently appeared on a website operated by Al–Sirri.

(S1 Ind. ¶¶ 30x–30y.) In a subsequent phone call on or about October 11, 2000, Yousry allegedly told Stewart that Sheikh Abdel Rahman did not want his attorneys to deny that he had issued the fatwah. (S1 Ind. ¶ 30z.) And during an attorney telephone call to Sheikh Abdel Rahman on or about October 20, 2000, Sheikh Abdel Rahman told Yousry that he did not personally issue the fatwah, but did not want anyone to deny he had made it because "it is good." (S1 Ind. ¶ 30bb.)

On or about October 25, 2000, the S1 Indictment charges, Sattar spoke by telephone to Taha, who told Sattar that "an Egyptian male" was involved in the bombing of the U.S.S. Cole, and that Sattar should assist in delivering a message to the United States government suggesting that similar attacks would occur unless Sheikh Abdel Rahman were freed from prison. (S1 Ind. ¶ 30cc.)

On or about May 7, 2001, Stewart signed an affirmation in which she agreed to abide by the terms of the SAMs then in effect on Sheikh Abdel Rahman. (S1 Ind. ¶ 30dd.) The S1 Indictment charges that, on or about July 13, 2001, during a prison visit to Sheikh Abdel Rahman by Stewart and Yousry, Yousry told Sheikh Abdel Rahman that Sattar had been informed that the U.S.S. Cole had been bombed on Sheikh Abdel Rahman's behalf and that Sattar was asked to convey to the United States government that more terrorist acts would follow if the United States government did not release Sheikh Abdel Rahman from custody. (S1 Ind. ¶ 30ee.) While Yousry was speaking to Sheikh Abdel Rahman, Stewart allegedly actively concealed the conversation between Sheikh Abdel Rahman and Yousry from prison guards by, among other things, shaking a water jar and tapping on the table while stating that she was "just doing covering noise." (S1 Ind. ¶ 30ee.) The S1 Indictment further charges that on a second day

of the prison visit by Stewart and Yousry, Yousry read letters to Sheikh Abdel Rahman and Sheikh Abdel Rahman dictated responsive letters to Yousry. (S1 Ind. ¶ 30ff.)

The S1 Indictment also alleges that on or about January 8, 2001, Sattar informed Stewart by telephone that a prison administrator where Sheikh Abdel Rahman was incarcerated had pleaded with Sheikh Abdel Rahman's wife to tell Sheikh Abdel Rahman to take insulin for his diabetes. (S1 Ind. ¶ 30gg.) Sattar and Stewart allegedly agreed that Sattar would issue a public statement falsely claiming that the Bureau of Prisons was denying medical treatment to Sheikh Abdel Rahman, even though Sattar and Stewart allegedly knew that Sheikh Abdel Rahman was voluntarily refusing to take insulin for his diabetes. (S1 Ind. ¶ 30gg.) Stewart allegedly expressed the opinion that this misrepresentation was "safe" because no one on the "outside" would know the truth. (S1 Ind. ¶ 30gg.) The S1 Indictment further alleges that Sattar and Al–Sirri thereafter wrote a statement falsely claiming that Sheikh Abdel Rahman was being denied insulin by the United States Government, a statement that Sattar and Al–Sirri disseminated to several news organizations, including Reuters, and on a website. (S1 Ind. ¶ 30hh–30ii.)

Count Two of the S1 Indictment charges that, from in or about September 1999 through in or about April 2002, in violation of 18 U.S.C. §§ 956(a)(1) and (a)(2)(A), defendant Sattar, Sheikh Abdel Rahman, Taha, and others known and unknown, conspired to murder and kidnap persons in a foreign country. (S1 Ind. ¶ 32.) In addition to realleging various of the acts described above, such as various activities of Taha and the issuance of the October 2000 fatwah, Count Two alleges that in or about September and October 2000, Sattar

allegedly participated in several telephone calls in an effort to facilitate a meeting in Egypt between Taha and Alaa Abdul Raziq Atia ("Atia"), an Islamic Group member who was wanted in connection with the 1997 Luxor terrorist attack in Egypt and who was a fugitive. (S1 Ind. ¶ 33b.) Sattar allegedly arranged and listened to various telephone calls between Taha and one of Atia's associates, an unindicted alleged co-conspirator, while they discussed the Islamic Group's use of military action and the upcoming meeting with Atia. (S1 Ind. ¶¶ 33c–33e.) On or about October 9, 2000, Sattar allegedly agreed during a telephone conversation with Taha to follow Taha's instructions to inform Atia's associate that Sheikh Abdel Rahman had issued a fatwah and to tell Atia's associate to instruct his associates that they "are supposed to go by it." (S1 Ind. ¶ 33f.) On or about October 11, 2000, Sattar allegedly told Taha in a telephone conversation that he had spoken with Atia and believed that Atia was eager, ready and able "to do things," and that he had to warn Atia repeatedly during their telephone conversation that his telephone was "not safe." (S1 Ind. ¶ 33g.) In a subsequent telephone call in November 2000, Taha allegedly told Sattar that he feared that Atia had been killed during a raid by Egyptian law enforcement, and noted that he had asked Atia about his "capacity" and discussed with Atia whether they would have a chance to "do something." (S1 Ind. ¶ 33h.)

Count Three of the S1 Indictment alleges that, from in or about September 1999 through in or about April 2002, defendant Sattar and others known and unknown, in violation of 18 U.S.C. § 373, solicited other persons to engage in violent terrorist operations worldwide to achieve the Islamic Group's objectives in violation of 18 U.S.C. §§ 956, 2332, and 2232b. (S1 Ind. ¶ 35.)

Count Four charges that, from in or about September 1999 through in or about April 2002, defendants Stewart and Yousry, together with others, conspired, in violation of 18 U.S.C. § 371, to violate 18 U.S.C. § 2339A. (S1 Ind. ¶ 37.) The alleged object of the conspiracy was to provide material support and resources, in the form of personnel, by making Sheikh Abdel Rahman available as a co-conspirator, and to conceal and disguise the nature, location, and source of personnel by concealing and disguising that Sheikh Abdel Rahman was a co-conspirator.[3] (S1 Ind. ¶ 38.) The S1 Indictment charges that Stewart and Yousry carried out this conspiracy knowing and intending that such material support and resources were to be used in preparation for, and in carrying out, the conspiracy charged in Count Two of the S1 Indictment—namely, the conspiracy to kill and kidnap persons in a foreign country—and in preparation for, and in carrying out, the concealment of such violation. (S1 Ind. ¶ 38.) Count Four realleges various overt acts in furtherance of the alleged conspiracy. (S1 Ind. ¶ 39.) Count Five charges defendants Stewart and Yousry with committing the substantive offense of violating 18 U.S.C. §§ 2339A and 2 that was the object of the conspiracy charged in Count Four. (S1 Ind. ¶ 41.)

Counts Six and Seven charge defendant Stewart with having made false statements in her affirmations submitted to the United States Attorney's Office for the Southern District of New York, in May 2000 and May 2001, respectively, stating that she would abide by the terms of the SAMs imposed on Sheikh Abdel Rahman, that

---

**3.** While the S1 Indictment had also alleged that Stewart and Yousry concealed and disguised the "ownership" of personnel, in response to the current motions, the Government agreed that the allegation should be stricken, and it is.

the translators accompanying her on prison visits would be used only for communications concerning legal matters, and that she would not use any communication with Sheikh Abdel Rahman to pass messages between Sheikh Abdel Rahman and third parties, including, but not limited to, the media. (S1 Ind. ¶¶ 43, 45.) The May 2001 affirmation is also alleged to be false in stating that Stewart "will only allow the meetings to be used for legal discussion between Abdel Rahman and [her]." (S1 Ind. ¶ 45.)

### C

Stewart now moves to dismiss Counts Four and Five of the S1 Indictment on the grounds that 18 U.S.C. § 2339A, as applied to Stewart, is unconstitutionally vague and overbroad. She moves to dismiss Counts Four and Five on the alternative grounds that they are impermissibly multiplicitous and that they impermissibly charge a double, or even triple, inchoate crime in violation of the Due Process Clause. She moves to dismiss Count Four on the grounds that it either violates the Ex Post Facto Clause or charges an offense that did not exist at the time of the alleged conduct. Stewart moves to dismiss Count One on the grounds that 18 U.S.C. § 371 fails to state an offense and is unconstitutionally vague as applied in this case. She moves to dismiss Counts One and Four as impermissibly multiplicitous, and she moves to dismiss Counts Six and Seven for failure to state an offense against the United States. She moves to dismiss Counts Four, Five, and Seven on the grounds of vindictive prosecution and, in the alternative, seeks an evidentiary hearing on the issue. For all counts not dismissed, Stewart seeks to strike as prejudicial surplusage various aspects of the S1 Indictment. She also moves to disqualify two of the Assistant United States Attorneys in the case because they allegedly ought to be witnesses. Stewart also seeks

a severance and immediate production of all statements of any defendant that the Government intends to use at trial. Stewart also seeks a bill of particulars.

Sattar moves to dismiss Count Two on the grounds that it is duplicitous and that it is the product of prosecutorial vindictiveness. He also moves for a bill of particulars and for pretrial access to Mohammed Abdel Rahman, whom Sattar believes to be in the custody of the United States.

### II

Stewart moves to dismiss Counts Four and Five on a number of grounds. Counts Four and Five charge Stewart and Yousry with conspiring to violate, and violating, 18 U.S.C. § 2339A.

Title 18, United States Code, section 2339A provided at all relevant times:

(a) Offense.—Whoever, within the United States, provides material support or resources or conceals or disguises the nature, location, source, or ownership of material support or resources, knowing or intending that they are to be used in preparation for, or in carrying out, a violation of section 32, 37, 81, 175, 351, 831, 842(m) or (n), 844(f) or (i), 930(c), 956, 1114, 1116, 1203, 1361, 1362, 1363, 1366, 1751, 1992, 2155, 2156, 2280, 2281, 2332, 2332a, 2332b, 2332c, or 2340A of this title or section 46502 of title 49, or in preparation for, or in carrying out, the concealment or an escape from the commission of any such violation, shall be fined under this title, imprisoned not more than 10 years, or both.

(b) Definition.—In this section, the term "material support or resources" means currency or other financial securities, financial services, lodging, training, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel, transpor-

tation, and other physical assets, except medicine or religious materials.

18 U.S.C. § 2339A.[4]

Counts Four and Five charge that Stewart and Yousry conspired to provide, and did in fact provide, material support knowing or intending that it would be used in preparation for, or in carrying out, the conspiracy charged in Count Two—the conspiracy to kill and kidnap persons in a foreign country in violation of 18 U.S.C. § 956—by making Sheikh Abdel Rahman available as a co-conspirator in the Count Two conspiracy. The Counts also charge that Stewart and Yousry conspired to, and did in fact, conceal and disguise the nature, location, and source of Sheikh Abdel Rahman as personnel preparing for, or carrying out, the conspiracy charged in Count Two. The S1 Indictment alleges, among other things, that Stewart and Yousry used prison visits with Sheikh Abdel Rahman to pass messages between Sheikh Abdel Rahman and his alleged Count Two co-conspirators, including Sattar. It also alleges that Stewart and Yousry took steps to conceal their efforts to pass messages between Sheikh Abdel Rahman and the alleged Count Two co-conspirators.

The charges in Counts Four and Five of the S1 Indictment differ from those in Counts One and Two in the original indictment that the Court previously dismissed. While the factual allegations are similar, the critical statute is different, the elements of the offense, including scienter, are different, and the allegations as to how the defendants' conduct violated the statute are different.

Counts One and Two of the original indictment charged that Sattar, Stewart, and Yousry conspired to violate 18 U.S.C. § 2339B and committed a substantive violation of that statute by, among other means, providing themselves as "personnel" to a designated FTO and by providing "communications equipment" to an FTO by using their own telephones to further the goals of an FTO.[5] Title 18 U.S.C. § 2339B, which was enacted about a year and a half after 18 U.S.C. § 2339A was enacted,[6] makes it a crime to, in relevant part, "knowingly provide[ ] material support or resources to a foreign terrorist organization." Section 2339B incorporates the definition of "material support or resources" from 18 U.S.C. § 2339A, and that definition includes, among other things, "personnel" and "communications equipment." Title 18 U.S.C. § 2339A, at issue in the S1 Indictment, and which Stewart and Yousry are alleged to have violated, does not penalize the provision of material support or resources to an FTO, but rather makes it a crime to provide material support or resources or conceal or disguise the nature, location, or source of such material support or resources "knowing or intending that they are to be used in preparation for, or in carrying out, a violation" of specific violent crimes—in this case, a violation of 18 U.S.C. § 956, which prohib-

---

4. The statute was enacted on September 13, 1994, Pub.L. No. 103–322, Title XII, § 120005(a), 108 Stat. 2022, and amended on April 24, 1996, Pub.L. No 104–132, Title III, § 323, 110 Stat. 1255; and October 11, 1996, Pub.L. No. 104–294, Title VI, §§ 601(b)(2), (s)(2), (3), 604(b)(5), 110 Stat. 3498, 3502, 3506; and October 26, 2001, Pub.L. No. 107–56, Title VIII, §§ 805(a), 810(c), 811(f), 115 Stat. 377, 380, 381; and twice more thereafter. The parties agree that the amendments to § 2339A in October 2001 and thereafter do not apply to the conduct charged in the S1 Indictment.

5. Yassir Al–Sirri, a defendant in the original indictment, is not a named defendant in the S1 Indictment.

6. Title 18 U.S.C. § 2339B was enacted on April 24, 1996, Pub.L. No. 104–132, Title III, § 303(a), 110 Stat. 1250, and amended on October 26, 2001, Pub.L. No. 107–56, Title VIII, § 810(d), 115 Stat. 380.

its a conspiracy to kill or kidnap persons in a foreign country. In the opinion dismissing Counts One and Two of the original indictment, the Court contrasted the intent requirements of the two statutes: "Section 2339B, which is alleged to have been violated [in the original indictment], requires only that a person 'knowingly' 'provides' 'material support or resources' to a 'foreign terrorist organization.' Section 2339A criminalizes the provision of 'material support or resources' 'knowing or intending that they are to be used in preparation for, or in carrying out,' a violation of various criminal statutes." *Sattar*, 272 F.Supp.2d at 356.

The Court dismissed Counts One and Two of the original indictment as unconstitutionally vague as applied to the conduct alleged in those counts. Concerning the "provision" of "communications equipment," the Court held that "by criminalizing the mere use of phones and other means of communication the statute provides neither notice nor standards for its application such that it is unconstitutionally vague as applied." *Sattar*, 272 F.Supp.2d at 358. The Court further concluded that by prohibiting the "provision" of "personnel," including oneself, to a "foreign terrorist organization," § 2339B could conceivably apply to someone engaging in advocacy on behalf of such an organization, conduct protected by the First Amendment. The Court noted that mere membership in an organization could not be prohibited without a requirement that the Government prove the defendants' specific intent to further the FTO's unlawful ends, *see NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 920, 102 S.Ct. 3409, 73 L.Ed.2d 1215 (1982), but the statute provided no means to distinguish providing oneself to an organization from mere membership in the organization. *Sattar*, 272 F.Supp.2d at 359.

The S1 Indictment, on the other hand, which charges a violation of 18 U.S.C. § 2339A rather than § 2339B, no longer charges Stewart and Yousry with providing themselves as personnel to an FTO, but rather with providing and conspiring to provide personnel—by making Sheikh Abdel Rahman, not themselves, available as a co-conspirator—to the conspiracy alleged in Count Two, namely the conspiracy to kill and kidnap persons in a foreign country. It also charges them with concealing and disguising the nature, location, and source of that personnel by disguising that Sheikh Abdel Rahman was a co-conspirator. These actions were allegedly done with the knowledge and intent that such personnel was to be used in preparation for, or in carrying out, the conspiracy to kill and kidnap persons in a foreign country. This is the heightened specific intent required by § 2339A.

Stewart argues that, despite the changes from the original indictment, the charges in Counts Four and Five of the S1 Indictment should be dismissed because 18 U.S.C. § 2339A should not be interpreted to reach the conduct alleged in Counts Four and Five, because § 2339A is unconstitutionally vague as applied to the allegations in the S1 Indictment, and because the statute is unconstitutionally overbroad.

### A

■ Stewart argues initially that 18 U.S.C. § 2339A does not cover the conduct in which she allegedly engaged. The S1 Indictment charges that Stewart and Yousry "provided" "personnel" by "making Abdel Rahman available" as a co-conspirator in the conspiracy to kill and kidnap persons in a foreign country. Stewart alleges that "provides" should not be interpreted to include "makes available" and that "personnel" should not include Sheikh Abdel Rahman. Stewart contends that the

term "making available" does not define the term "provides," but rather represents an impermissible attempt by the Government to expand the statute's reach. Stewart would limit the word "provides" to the physical transfer of an item.

■ The term "provides" is not defined in § 2339A. Where words in a statute are not defined, they "must be given their ordinary meaning." *Chapman v. United States,* 500 U.S. 453, 462, 111 S.Ct. 1919, 114 L.Ed.2d 524 (1991); *see also Smith v. United States,* 508 U.S. 223, 228, 113 S.Ct. 2050, 124 L.Ed.2d 138 (1993) ("When a word is not defined by statute, we normally construe it in accord with its ordinary or natural meaning."). The plain and ordinary meaning of the transitive verb "provide" is "[t]o furnish; supply ... [t]o make ready ... [t]o make available; afford." *Webster's II: New Riverside University Dictionary* 948 (1994); *see also The American Heritage Dictionary of the English Language* 1411 (4th ed.2000) (defining "provide" to include such meanings as "[t]o furnish; supply" and "[t]o make available; afford").

■ Moreover, statutory terms are to be interpreted in their context in light of their "placement and purpose in the statu-

tory scheme." *Holloway v. United States,* 526 U.S. 1, 6, 119 S.Ct. 966, 143 L.Ed.2d 1 (1999) (internal citation omitted). In this case, "provides" is the verb used for a variety of items defined as "material support or resources," including "financial services, lodging, training, ... [and] transportation...." 18 U.S.C. § 2339A(b). A defendant would reasonably be providing material support or resources by making these items or services available with the requisite knowledge or intent. Limiting the definition of "provides" to the physical transfer of an asset would result in a strained and untenable reading of the statute. Thus, there is no basis to limit the meaning of "provides ... personnel" to the physical transfer of personnel, and not to include making personnel available—which is in accord with the ordinary and natural use of the term "provide," and which is consistent with its placement in the statute and the purpose of proscribing the provision of resources to be used for a prohibited purpose.[7]

Relying on the interpretive canon *ejusdem generis,* Stewart contends that the phrase "and other physical assets" in the definition of "material support or resources" requires "some element of physi-

---

**7.** Stewart contends that this Court previously rejected a reading of "provides" that includes "making available." She quotes the following language from the Court's prior opinion, discussing the provision of "communications equipment": "The Government argued in its brief that the defendants are charged not merely with using their own phones or other communications equipment but with actively making such equipment available to IG and thus 'providing' IG with communications resources that would otherwise be unavailable to the FTO. That argument, however, simply ignores the reality of the facts charged in the Indictment in which various defendants are accused of having participated in the use of communications equipment." *Sattar,* 272 F.Supp.2d at 358. This excerpt does not amount to a rejection of "making available"

as a possible meaning of "provide." The Court concluded that the Government had not alleged that the defendants made communications equipment available to an FTO, not that the Government could not so allege. The ultimate defect in the original indictment with respect to the "provision" of communications equipment to an FTO in alleged violation of § 2339B was that the defendants "were not put on notice that merely using communications equipment in furtherance of an FTO's goals constituted criminal conduct." *Id.* The present charges do not allege the "use" of any resources. Moreover, the prior opinion addresses a different statute, 18 U.S.C. § 2339B, and does not change the analysis of the plain meaning of the words used when applied to the provision of personnel in the context of 18 U.S.C. § 2339A.

cal reality" to anything provided as material support, and that because Sheikh Abdel Rahman was in prison he could be provided only in "some intangible, evanescent sense." (Stewart Mem. at 47.) The argument has no merit.[8] The term "and other physical assets" requires only that other assets not specifically defined as "material support or resources" be physical assets rather than intangible assets. It does not detract from the fact that some of the listed specific assets may in fact be other than physical assets, such as "financial services" and "training." Moreover, the argument simply has nothing to do with this case, because it is clear that Sheikh Abdel Rahman is "tangible." To the extent that the thrust of the argument is that the act of providing must be "physical," the term "provides" in § 2339A(a) is not modified by the word "physical" in the definition of "material support or resources" contained in § 2339A(b).

Stewart also raises questions whether the meaning of "personnel" in the statute can be interpreted to include Sheikh Abdel Rahman. However, the Government is correct that, in using the term "personnel" in § 2339A, Congress plainly intended to refer to persons engaged in "prepar[ing] for" or "carry[ing] out" one of the crimes specified in § 2339A, or in "prepar[ing] for" or "carry[ing] out[ ] the concealment or an escape from the commission of any such" crime—that is, persons who are jointly involved in participating in those crimes. This meaning comports with the plain meaning of "personnel," which is defined as "[t]he body of persons employed by or active in an organization, business, or service." *Webster's II: New Riverside University Dictionary* 877 (1994); *see also The American Heritage Dictionary of the English Language* 1311 (4th ed.2000) (defining "personnel" as "[t]he body of persons employed by or active in an organization, business, or service"). Understanding "personnel" to refer to those persons engaging together in preparing for or carrying out the enumerated crimes also comports with the use of "personnel" in the context of the statute, because the statute specifically prohibits the provision of material support or resources, which includes personnel, to be used in preparing for, or carrying out, the specified crimes. *See Tyler v. Cain,* 533 U.S. 656, 662, 121 S.Ct. 2478, 150 L.Ed.2d 632 (2001) ("We do not . . . construe the meaning of statutory terms in a vacuum. Rather, we interpret the words in their context and with a view to their place in the overall statutory scheme." (internal quotation marks omitted)). Given the ordinary meaning of the word "personnel," and its context within the statute, the statute prohibits the provision of persons who will be used in preparing for, or carrying out, the crimes listed in § 2339A—that is, persons who are jointly involved in participating in those crimes.

---

**8.** According to the interpretive canon *ejusdem generis,* "[w]here general words follow specific words in a statutory enumeration, the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words." *Circuit City Stores, Inc. v. Adams,* 532 U.S. 105, 114–15, 121 S.Ct. 1302, 149 L.Ed.2d 234 (2001). Stewart actually applies what could be labeled "reverse *ejusdem generis,"* because she seeks to use the general words ("other physical assets") to shed light on the meaning of specific words. *See Dong v. Smithsonian Inst.,* 125 F.3d 877, 879–80 (D.C.Cir.1997) ("[F]or those who collect canons of construction it might be termed an application of reverse ejusdem generis (where the general term reflects back on the more specific rather than the other way around), [so] that the phrase 'A, B, or any other C' indicates that A is a subset of C." (internal quotation marks omitted)). In any event, for the reasons explained in the text, the argument has no application to the facts of this case and the terms of the statute are clear.

Stewart also argues that the rule of lenity should be used to avoid the application of the statute to her alleged provision of Sheikh Abdel Rahman as personnel to the alleged conspiracy to kill and kidnap persons in a foreign country. However, the language and context of the terms in the statute, "provides" and "personnel" are not ambiguous terms in the statute, and the ordinary meaning of those terms in the context of the statute covers making Sheikh Abdel Rahman available to the conspiracy to kill and kidnap persons in a foreign country. The rule of lenity provides no argument to the contrary. As the Supreme Court has explained:

> The rule of lenity ... is not applicable unless there is a "grievous ambiguity or uncertainty in the language and structure of the Act," such that even after a court has " 'seize[d] every thing from which aid can be derived,' " it is still "left with an ambiguous statute." "The rule [of lenity] comes into operation at the end of the process of construing what Congress has expressed, not at the beginning as an overriding consideration of being lenient to wrongdoers."

*Chapman v. United States,* 500 U.S. 453, 463, 111 S.Ct. 1919, 114 L.Ed.2d 524 (1991) (internal citations omitted). The Supreme Court has further instructed that "[b]ecause the meaning of language is inherently contextual, we have declined to deem a statute 'ambiguous' for purposes of lenity merely because it was *possible* to articulate a construction more narrow than that urged by the Government." *Moskal v. United States,* 498 U.S. 103, 108, 111 S.Ct. 461, 112 L.Ed.2d 449 (1990). In this case, because the language and statutory structure are not ambiguous, the rule of lenity does not indicate that the statute should not apply in this case.

Finally, Stewart argues that even if the terms of § 2339A literally reach the conduct charged, it should not cover the conduct of lawyers and she analogizes to the fact that professional baseball is exempt from the antitrust laws. But there is nothing in the text of the statute, indeed in any source, that indicates that lawyers are exempt from the coverage of this statute. The baseball analogy is completely inapt and has nothing to do with this case.

### B

■ Stewart also argues that § 2339A is unconstitutionally vague in its proscription of "provid[ing]" material support or resources in the form of "personnel," and in its proscription of "conceal[ing] or disguis[ing] the nature, location, [or] source" of "personnel." Stewart contends that § 2339A does not provide fair notice of the acts that are prohibited by its proscription of providing personnel.

■ Stewart contends that § 2339A is unconstitutionally vague as applied to the conduct alleged to be unlawful in Counts Four and Five of the S1 Indictment.[9] "[T]he void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson,* 461 U.S. 352, 357, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983); *see also United*

---

9. Stewart states that she is not arguing that § 2339A is facially vague, but rather that it is vague as applied to the conduct alleged. (Stewart Mem. at 38 n. 55 ("We are not saying that the statute will always flunk a vagueness test. There may be acts of providing personnel, within some accepted meaning of that term, that could be punishable.").) There is no occasion, therefore, to address the standards to be applied to statutes which are challenged as facially vague. *See United States v. Rybicki,* 354 F.3d 124, 131 (2d Cir. 2003) (en banc).

*States v. Roberts*, 363 F.3d 118, 122–24 (2d Cir.2004) (applying *Kolender* and finding that the term "controlled substance analogue" in 21 U.S.C. § 802(32)(A) was not unconstitutionally vague as applied to the specific substance at issue); *United States v. Rybicki*, 354 F.3d 124, 129, 132, 134 (2d Cir.2003) (en banc). "[A] court must first determine whether the statute gives the person of ordinary intelligence a reasonable opportunity to know what is prohibited and then consider whether the law provides explicit standards for those who apply it." *Chatin v. Coombe*, 186 F.3d 82, 87 (2d Cir.1999) (quoting *United States v. Strauss*, 999 F.2d 692, 697 (2d Cir.1993)); *Sattar*, 272 F.Supp.2d at 357.

 For the reasons already explained, the "provision" of "personnel"—in this case, by making Sheikh Abdel Rahman available as a co-conspirator in a conspiracy to kill and kidnap persons in a foreign country—is conduct that plainly is prohibited by the statute. The statute defines the offense with sufficient definiteness that ordinary people can understand what conduct is prohibited.[10]

In light of the plain meaning of the term "personnel" as used in the context of § 2339A, Stewart's reliance on cases, including this Court's prior opinion, that have found the term "personnel" in 18 U.S.C. § 2339B unconstitutionally vague is misplaced. Section 2339B makes it a crime to "provide[ ] material support or resources to a foreign terrorist organiza-

tion" that has been designated as such by the Secretary of State. 18 U.S.C. § 2339B(a)(1), (g)(6). The statute's potential reach raises significant First Amendment concerns, because § 2339B's ban on providing personnel to a "foreign terrorist organization" could trench upon associational and expressive freedoms—including pure advocacy—protected by the First Amendment. The statute, as this Court explained, was particularly problematic as applied to the conduct of persons allegedly providing themselves as personnel to the organization. *See Humanitarian Law Project v. Reno*, 205 F.3d 1130, 1137 (9th Cir.2000) ("It is easy to see how someone could be unsure about what [18 U.S.C. § 2339B] prohibits with the use of the term 'personnel,' as it blurs the line between protected expression and unprotected conduct. Someone who advocates the cause of [an FTO] could be seen as supplying them with personnel.... But advocacy is pure speech protected by the First Amendment."); *Sattar*, 272 F.Supp.2d at 359 ("It is not clear from § 2339B what behavior constitutes an impermissible provision of personnel to an FTO.... [T]he Government fails to explain how a lawyer, acting as an agent of her client, an alleged leader of an FTO, could avoid being subject to criminal prosecution as an 'quasi-employee' allegedly covered by the statute."). The Court of Appeals for the Ninth Circuit has held that these concerns are not displaced even when 18 U.S.C.

10. To the extent that Stewart argues that the statute is unconstitutionally vague as applied to the allegation that she "concealed and disguised" the nature, location, and source of personnel by concealing and disguising that Sheikh Abdel Rahman was a conspirator, the argument has no merit. All of the terms have ordinary and obvious meanings that ordinary people can understand. The argument really appears to be that the Government could not prove that the defendants "disguised" and "concealed" Sheikh Abdel Rahman when he

was in federal custody. But the Government responds that that Stewart and Yousry conspired to and did conceal and disguise the fact that Sheikh Abdel Rahman was a continuing member of the conspiracy to kill and kidnap persons in a foreign country and made it appear that he was simply a prisoner complying with his SAMs. Whether the Government will be able to prove its allegations is a question for the jury. The statute is not unconstitutionally vague as applied to such conduct.

§ 2339B is construed to include a requirement that the accused knew of the organization's designation as an FTO or of the organization's unlawful activities that caused it to be so designated. *See Humanitarian Law Project v. U.S. Dept. of Justice*, 352 F.3d 382, 404–05 (9th Cir. 2003).[11]

The First Amendment concerns raised by the use of "personnel" in § 2339B, as applied to persons who provided themselves as "personnel" to an organization, are simply not present in this case. Section 2339A is being applied to persons who allegedly provided other personnel "knowing and intending that [it is] to be used in preparation for, or in carrying out" a violation of specific statutes, in this case a conspiracy to kill or kidnap persons in a foreign country. The allegations in this case do not concern the scope of membership in an organization or the permissible extent of advocacy. The First Amendment provides no protection for the conduct of providing resources knowing and intending that they are to be used for crimes of violence. *See Claiborne Hardware*, 458 U.S. at 916, 102 S.Ct. 3409 ("The First Amendment does not protect violence. Certainly violence has no sanctuary in the First Amendment, and the use of weapons, gunpowder, and gasoline may not constitutionally masquerade under the guise of advocacy." (internal quotation marks and citation omitted)).

Moreover, § 2339A which is at issue in this case contains a high scienter requirement, which is not present in § 2339B. While § 2339B prohibits the "knowing"

provision of material support or resources to an FTO, § 2339A applies only when the defendant provides material support or resources "knowing or intending" that they are to be used in preparation for, or in carrying out, specific violent crimes, in this case a conspiracy to kill or kidnap persons in a foreign country. The Supreme Court has explained that the constitutionality of an allegedly vague statutory standard "is closely related to whether that standard incorporates a requirement of *mens rea.*" *Colautti v. Franklin*, 439 U.S. 379, 395, 99 S.Ct. 675, 58 L.Ed.2d 596 (1979). "[A] scienter requirement may save a statute which might otherwise have to be condemned for vagueness. . . ." *United States v. Curcio*, 712 F.2d 1532, 1543 (2d Cir.1983) (Friendly, J.) (explaining the origin of the doctrine in the plurality opinion in *Screws v. United States*, 325 U.S. 91, 101–02, 65 S.Ct. 1031, 89 L.Ed. 1495 (1945)). A defendant cannot complain about a lack of notice when the statute requires a high level of specific intent for a violation. Hence, due process concerns about notice under the test for vagueness are "ameliorated" when a statute contains a scienter requirement. *Hill v. Colorado*, 530 U.S. 703, 732, 120 S.Ct. 2480, 147 L.Ed.2d 597 (2000); *United States v. Strauss*, 999 F.2d 692, 698 (2d Cir.1993) (noting that a " 'scienter requirement may mitigate a law's vagueness, especially with respect to the adequacy of notice . . . that [the] conduct is proscribed' " (quoting *United States v. Schneiderman*, 968 F.2d 1564, 1568 (2d Cir.1992))). Section 2339A applies only to those people who provide

---

**11.** The meaning of "personnel" is clear in the context of § 2339A when applied to personnel who are to be used in preparation for, or in carrying out, specific crimes. *See* p. 298, *supra*. Moreover, the Government in this case has not sought to apply § 2339A to the provision by a person of himself or herself to such activity, and § 2339A does not raise the issues

of providing "personnel" to an organization. Thus, the Government has not sought to provide any evolving definitions of "personnel" to preserve the constitutionality of § 2339A, *compare Sattar*, 272 F.Supp.2d at 358–60, and "personnel" is appropriately read in the context of § 2339A as those persons jointly in-

material support or resources "knowing or intending" that the support or resources are to be used in preparation for, or in carrying out, a violation of enumerated criminal statutes, in this case a conspiracy to kill and kidnap persons in a foreign country. Defense counsel candidly admitted at argument that he knew of no case with a similar heightened scienter requirement that had ever been found to be unconstitutionally vague as applied. (Transcript of Hearing dated April 9, 2004 ("Tr.") at 21.) Whether Stewart and Yousry had the requisite intent is, of course, a question of fact for the jury. The Government's burden at trial will be rigorous. But that culpable intent puts ordinary persons on notice that their conduct is within the scope of the statute and potentially subject to criminal liability.

Stewart contends that the statute is unconstitutionally vague because a conscientious lawyer representing her client could not avoid "making her client 'available' through ... services that a lawyer regularly and lawfully performs." (Stewart Mem. at 35.) Lawyers, including defense lawyers, are not immune from criminal liability arising out of offenses committed while representing clients, and indeed defense counsel conceded at argument that

lawyers have no license to violate generally applicable criminal laws.[12] *See United States v. Cintolo*, 818 F.2d 980, 990 (1st Cir.1987) ("As important a role as defense counsel serve—and we do not minimize its importance one whit—the acceptance of a retainer by a lawyer in a criminal case cannot become functionally equivalent to the lawyer's acceptance of a roving commission to flout the criminal law with impunity. A criminal lawyer has no license to act as a lawyer-criminal."); *see also* Tr. at 29–31. And § 2339A sets forth with sufficient clarity the conduct it criminalizes so that ordinary people—including, as here, criminal defense lawyers—can understand what conduct is prohibited and so that arbitrary and discriminatory enforcement of the statute is not encouraged. A person of ordinary intelligence can discern that a lawyer's legitimate representation of a client does not extend to the point at which the lawyer "know[s] or intend[s] that [material support or resources] are to be used in preparation for, or in carrying out, a violation of [specified crimes], or in preparation for, or in carrying out, the concealment or an escape from the commission of any such violation." 18 U.S.C. § 2339A(a). It is plain to anyone of ordi-

---

volved in preparing for or carrying out the enumerated crimes.

**12.** For example, lawyers can be held criminally liable for violating the obstruction-of-justice statute, 18 U.S.C. § 1503, even when engaging in traditional litigation-related conduct on behalf of their clients, and courts have specifically rejected challenges that the statute was unconstitutionally vague as applied to the conduct of lawyers. *See United States v. Cueto*, 151 F.3d 620, 631 (7th Cir. 1998) ("Otherwise lawful conduct, even acts undertaken by an attorney in the course of representing a client, can transgress § 1503 if employed with the corrupt intent to accomplish that which the statute forbids.... It is undisputed that an attorney may use any *lawful* means to defend his client, and there is no risk of criminal liability if those means employed by the attorney in his endeavors to

represent his client remain within the scope of lawful conduct."); *United States v. Cintolo*, 818 F.2d 980, 996 (1st Cir.1987) ("Our ruling today does not interfere with legitimate avenues of advocacy or the ethical conduct of even the most vigorous representation. We do nothing more than apply a criminal statute, aimed at protecting the sanctuary of justice from malevolent influences, in a sober and impartial fashion. Shorn of hyperbole, appellant's argument reduces to the thoroughly unsupportable claim that § 1503 has two levels of meaning—one (more permissive) for attorneys, one (more stringent) for other people. We see nothing to recommend the proposition that attorneys can be of easier virtue than the rest of society in terms of the criminal code. As citizens of the Republic equal under law, all must comply with the same statute in the same manner.").

nary intelligence what conduct the statute proscribes.

Section 2339A also passes the second test for vagueness because is provides reasonable standards for its enforcement. The second requirement under the void-for-vagueness doctrine is that Congress "establish minimal guidelines to govern law enforcement." *Kolender*, 461 U.S. at 358, 103 S.Ct. 1855 (internal quotation marks omitted). "Where the legislature fails to provide such minimal guidelines, a criminal statute may permit a standardless sweep that allows policemen, prosecutors, and juries to pursue their personal predilections." *Id.* (internal quotation marks and alterations omitted). Nevertheless, "[a]s always, enforcement requires the exercise of some degree of police judgment." *Hill,* 530 U.S. at 733, 120 S.Ct. 2480 (internal quotation marks omitted). The statute here does not leave it to the arbitrary whims of police, prosecutors, and juries to determine who has violated its commands. The statute lays out with sufficient definiteness what is prohibited, and the specific intent that is required, so that enforcement of the statute is not left to the arbitrary and discriminatory choices of law enforcement officials. Stewart's motion to dismiss Counts Four and Five as unconstitutionally vague is therefore denied.

## C

■ Stewart also contends that § 2339A is vague as applied because Count Two, which charges a conspiracy to violate 18 U.S.C. § 956, does not satisfy the pleading requirements of *Russell v. United States,* 369 U.S. 749, 82 S.Ct. 1038, 8 L.Ed.2d 240 (1962). Stewart contends that Count Two is defective because it alleges that Sattar, Sheikh Abdel Rahman, Taha, and others known and unknown "conspired ... to murder and kidnap persons in a foreign

country," without identifying the "persons" or "foreign country" with any specificity. (S1 Ind. ¶ 32.) Stewart argues that Counts Four and Five should therefore be dismissed because they depend on providing Sheikh Abdel Rahman as a co-conspirator in the conspiracy charged in Count Two.

■■ Federal Rule of Criminal Procedure 7(c)(1) provides that an Indictment "shall be a plain, concise and definite statement of the essential facts constituting the offense charged." [13] "An indictment is sufficient when it charges a crime with sufficient precision to inform the defendant of the charges he must meet and with enough detail that he may plead double jeopardy in a future prosecution based on the same set of facts." *United States v. Stavroulakis,* 952 F.2d 686, 693 (2d Cir.1992) (citing *Russell,* 369 U.S. 749, 763–64, 82 S.Ct. 1038, 8 L.Ed.2d 240 (1962)). Moreover, " 'an indictment need do little more than track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime.' " *Id.* (quoting *United States v. Tramunti,* 513 F.2d 1087, 1113 (2d Cir.1975)). The Court of Appeals for the Second Circuit has also noted that " '[a]n indictment must be read to include facts which are necessarily implied by the specific allegations made.' " *Id.* (quoting *United States v. Silverman,* 430 F.2d 106, 111 (2d Cir.1970)); *see also Sattar,* 272 F.Supp.2d at 373.

Count Two tracks the language of 18 U.S.C. § 956, which provides:

Whoever, within the jurisdiction of the United States, conspires with one or more other persons, regardless of where such other person or persons are located, to commit at any place outside the United States an act that would constitute the offense of murder, kidnapping, or maiming if committed in the special

---

**13.** The December 2002 Amendments to the

Criminal Rules did not change this language.

maritime and territorial jurisdiction of the United States shall, if any of the conspirators commits an act within the jurisdiction of the United States to effect any object of the conspiracy, be punished as provided in subsection (a)(2).

18 U.S.C. § 956(a)(1). By tracking the language of § 956, Count Two satisfies the well-established pleading requirements in this Circuit. The language of § 956(a) does not require that an indictment allege the identities of contemplated victims or the specific location outside the United States where the contemplated killing, kidnapping, or maiming is to occur. *Cf. United States v. Salameh,* 152 F.3d 88, 154 n. 16 (noting that, to prove bombing conspiracy under statutes referring to crimes against "any" building, vehicle, or property, Government was not required to prove that defendant "agreed to bomb a 'populated structure in an urban area," because "[n]one of the four criminal objectives charged in the indictment required the government to prove that the defendant was aware of the specific target of the bombing"). Nor are these specific facts an essential element of the crime charged. *See United States v. Wharton,* 320 F.3d 526, 537–38 (5th Cir.2003) ("To obtain a conviction for conspiracy to kill in a foreign country, the government must prove that: (1) the defendant agreed with at least one person to commit murder; (2) the defendant willfully joined the agreement with the intent to further its purpose; (3) during the existence of the conspiracy, one of the conspirators committed at least one overt act in furtherance of the object of the conspiracy; and (4) at least one of the conspirators was within the jurisdiction of the United States when the agreement was made."). Count Two charges a violation of § 956 with sufficient precision to inform Sattar—the only defendant named in Count Two—of the charges he must meet and to permit him to inter-

pose a plea of double jeopardy if warranted in a future prosecution. In any event, the Government also represented at the argument of the motions that it does not intend to prove at trial that there were any specific identifiable victims of the conspiracy alleged in Count Two. (Tr. 39.) The defendants' requests for bills of particulars are discussed below.

**D**

Stewart also contends that Counts Four and Five should be dismissed on the grounds that § 2339A is unconstitutionally overbroad. Under the First Amendment doctrine of overbreadth, a statute is invalid when it brings within its scope—and thus threatens to chill—conduct protected by the First Amendment. *See Virginia v. Hicks,* 539 U.S. 113, 123 S.Ct. 2191, 2196, 156 L.Ed.2d 148 (2003). As the Court explained in rejecting the defendants' previous challenge to 18 U.S.C. § 2339B on overbreadth grounds, the Supreme Court has instructed that:

facial overbreadth adjudication is an exception to our traditional rules of practice and [ ] its function, a limited one at the outset, attenuates as the otherwise unprotected behavior that it forbids the State to sanction moves from 'pure speech' toward conduct and that conduct—even if expressive—falls within the scope of otherwise valid criminal laws that reflect legitimate state interests in maintaining comprehensive controls over harmful, constitutionally unprotected conduct.

*Broadrick v. Oklahoma,* 413 U.S. 601, 615, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973). Therefore, "particularly where conduct and not merely speech is involved, we believe that the overbreadth of a statute must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep." *Id.* The Supreme Court has recently reaffirmed this principle and explained that because

"there are substantial social costs *created by the overbreadth doctrine when it blocks* application of a law to constitutionally unprotected speech, or especially to constitutionally unprotected conduct .... we have insisted that a law's application to protected speech be 'substantial,' not only in an absolute sense, but also relative to the scope of the law's plainly legitimate applications." *Hicks,* 123 S.Ct. at 2197 (emphasis in original) (quoting *Broadrick,* 413 U.S. at 615, 93 S.Ct. 2908). Therefore, § 2339A is invalid under the overbreadth doctrine only if the statute, *"taken as a whole,* is substantially overbroad judged in relation to its plainly, legitimate sweep." *Id.* at 2198 (emphasis in original).

Section 2339A prohibits the provision of material support or resources knowing or intending that they are to be used in preparation for, or in carrying out, a violation of certain enumerated federal crimes. *See* 18 U.S.C. § 2339A. On its face, § 2339A is a legitimate exercise of Congress' power to enact criminal laws that reflect "legitimate state interests in maintaining comprehensive controls over harmful, constitutionally unprotected conduct." *Broadrick,* 413 U.S. at 615, 93 S.Ct. 2908. In order to prevail on her overbreadth claim, Stewart bears the burden of demonstrating, "from the text of [the law] and from actual fact, that substantial overbreadth exists." *Hicks,* 123 S.Ct. at 2198, 123 S.Ct. 2191

(internal quotation marks and punctuation omitted) (alteration in original). In this case, Stewart has not demonstrated that § 2339A, on its face or in actual fact, prohibits any constitutionally protected expression, much less that any possible overbreadth is "substantial" when judged in relation to the statute's plainly legitimate sweep. The motion to dismiss on overbreadth grounds is therefore denied.

## E

██ Stewart also contends that Counts Four and Five must be dismissed because they impermissibly charge a double, or even triple, inchoate offense. An "inchoate offense" is a step toward the commission of another crime, the step itself being serious enough to merit punishment.[14] *Black's Law Dictionary* 1108 (7th ed.1999). Stewart contends that Count Four charges, at best, a "conspiracy to conspire," and, at worst, a "conspiracy to facilitate to conspire."[15] Stewart contends that Count Four essentially charges Stewart and Yousry with conspiring to facilitate the conspiracy in Count Two, a conspiracy in which they are not alleged to have participated. Stewart does not cite any cases that support her reading of Count Four, or that provide any basis for her theory to dismiss a count that otherwise charges a violation of a federal criminal statute.[16]

14. While the three inchoate offenses are described as attempt, conspiracy, and solicitation, the description has been criticized because the word "inchoate" describes something uncompleted, while it is the ultimate crime that may be inchoate rather than the preliminary crime. *See Black's Law Dictionary* 1108–09 (7th ed.1999).

15. Stewart contends that Count Five is also impermissibly inchoate because it charges preparation to conspire and preparing to conceal a conspiracy. (Stewart Mem. at 53.) This reading of Count Five is simply wrong. Count Five charges a substantive violation of

18 U.S.C. § 2339A and *is not an inchoate* offense.

16. Stewart relies on an excerpt from a footnote in *United States v. Meacham,* 626 F.2d 503 (5th Cir.1980), in which the Court of Appeals for the Fifth Circuit derided in dicta the possibility of criminal liability for an "attempt to conspire." *Id.* at 509 n. 7. This case provides no support for Stewart's argument. Count Four does not charge an "attempt to conspire." As explained more fully in the text, Count Four charges a conspiracy, in violation of 18 U.S.C. § 371, to commit a violation of 18 U.S.C. § 2339A.

Stewart's argument distorts the charge made in Count Four. Count Four charges a conspiracy, in violation of 18 U.S.C. § 371, to violate 18 U.S.C. § 2339A, not a double or triple inchoate offense. The object of the conspiracy alleged in Count Four is a violation of § 2339A, not the commission of another inchoate offense. Count Four charges that Stewart and Yousry conspired to violate § 2339A by providing Sheikh Abdel Rahman as "personnel" to the conspiracy alleged in Count Two, and by concealing the fact that Sheikh Abdel Rahman was a member of the Count Two conspiracy. Stewart and Yousry are not charged with having been co-conspirators in the Count Two conspiracy.

The fact that Stewart and Yousry are alleged in Count Four to have conspired to provide material support to a conspiracy to violate 18 U.S.C. § 956 does not make Count Four a double inchoate offense. As explained above, 18 U.S.C. § 2339A, which proscribes the provision of material support to, among other things, a conspiracy to violate 18 U.S.C. § 956, is not impermissibly vague. The fact that another conspiracy is involved in the proof of Count Four does not provide any basis to dismiss Count Four. *See United States v. Ruggiero,* 726 F.2d 913, 923 (2d Cir.1984) (RICO conspiracy under 18 U.S.C. § 1962(d) supported by predicate acts of racketeering activity that in themselves are conspiracies is permissible). Section 2339A provides reasonable notice of the conduct it proscribes; a conspiracy to commit a substantive violation of that statute is not impermissibly inchoate. Stewart's motion to dismiss Counts Four and Five as impermissible double, or triple, inchoate offenses is denied.

### F

Stewart also moves to dismiss Counts Four and Five as multiplicitous. The argument has no merit. Count Four charges Stewart and Yousry with conspiring, in violation of 18 U.S.C. § 371, to provide and conceal material support in violation of 18 U.S.C. § 2339A, and Count Five charges Stewart and Yousry with the substantive offense of providing and concealing material support in violation of 18 U.S.C. § 2339A. It is well established that a conspiracy and the substantive offense are separate crimes that may be charged separately. *See, e.g., Pereira v. United States,* 347 U.S. 1, 11, 74 S.Ct. 358, 98 L.Ed. 435 (1954) ("[T]he commission of a substantive offense and a conspiracy to commit it are separate and distinct crimes, and a plea of double-jeopardy is no defense to a conviction for both."). Stewart's motion to dismiss on these grounds is denied.

### G

Stewart also moves to dismiss Count Four on the grounds that it either violates the Ex Post Facto Clause or charges an offense that did not exist throughout the period of the charged conspiracy. Stewart contends that by adding a conspiracy provision to 18 U.S.C. § 2339A for the first time in October 2001, Congress created conspiracy liability where none had existed before, and that Count Four therefore fails on ex post facto grounds. She contends in the alternative that if Congress intended to supplant the conspiracy liability in 18 U.S.C. § 371 with that in § 2339A, then § 371 was not in effect during several months of the charged conspiracy, which allegedly continued through in or about April 2002. These arguments have no merit. Count Four charges Stewart with violating 18 U.S.C. § 371 by conspiring to violate 18 U.S.C. § 2339A. Section 371 was in existence throughout the period of the charged conspiracy, so there is no ex post facto violation. There is no indication that when Congress added the conspiracy provision to § 2339A, which carries more severe

penalties than § 371 and which does not have § 371's overt act requirement, Congress intended to repeal § 371, and such a repeal will not be implied. *See Blumenthal v. United States,* 332 U.S. 539, 560 n. 18, 68 S.Ct. 248, 92 L.Ed. 154 (1947) (rejecting argument that conspiracy provision added to a new criminal statute had impliedly repealed § 37, the general conspiracy provision that was the predecessor to § 371, in part because, as here, "[c]onviction under the general conspiracy statute requires more than mere agreement, namely, the commission of an overt act"). Stewart's motion to dismiss Count Four on these grounds is denied.

## III

 Stewart moves to dismiss Counts One and Four as multiplicitous. She contends that the two conspiracies charged in Counts One and Four are in fact a single conspiracy that is impermissibly charged as separate offenses.

 "An indictment is multiplicitous when it charges a single offense as an offense multiple times, in separate counts, when, in law and fact, only one crime has been committed." *United States v. Chacko,* 169 F.3d 140, 145 (2d Cir.1999); *see also United States v. Holmes,* 44 F.3d 1150, 1153–54 (2d Cir.1995). Multiplicitous indictments violate the Double Jeopardy Clause of the Fifth Amendment because they subject a person to punishment for a single crime more than once. *United States v. Dixon,* 509 U.S. 688, 696, 113 S.Ct. 2849, 125 L.Ed.2d 556 (1993); *Chacko,* 169 F.3d at 145. The offense in a charge of conspiracy is "the agreement or confederation of the conspirators to commit one or more unlawful acts." *Braverman v. United States,* 317 U.S. 49, 53, 63 S.Ct. 99, 87 L.Ed. 23 (1942). Therefore, "[a] single agreement to commit several crimes constitutes one conspiracy," but "multiple agreements to commit separate crimes constitute multiple conspiracies."

*United States v. Broce,* 488 U.S. 563, 570–71, 109 S.Ct. 757, 102 L.Ed.2d 927 (1989). In determining whether a defendant engaged in a single conspiracy or multiple conspiracies, the focus must be "on what agreement, if any, the jury could reasonably have found to exist vis-a-vis each defendant." *United States v. Johansen,* 56 F.3d 347, 351 (2d Cir.1995). The Court of Appeals has directed that, in determining whether two conspiracies amount to the "same offense," a variety of factors should be considered, including the criminal offenses charged, the overlap of participants, the overlap of time, similarity of operation, the existence of common overt acts, the geographic scope of the alleged conspiracies or location where overt acts occurred, common objectives, and the degree of interdependence between alleged distinct conspiracies. *United States v. Macchia,* 35 F.3d 662, 667 (2d Cir.1994) (citing *United States v. Korfant,* 771 F.2d 660, 662 (2d Cir.1985)).

The conspiracies in Counts One and Four are both alleged to have violated the general federal conspiracy statute, 18 U.S.C. § 371 (1988), which provides in pertinent part:

> If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be [guilty of a crime].

18 U.S.C. § 371. Section 371 "prohibits two distinct types of conspiracies; conspiracies to defraud the United States and conspiracies to commit an offense against the United States. While the offense clause governs a conspiracy to commit a specific offense, defined elsewhere in the federal criminal code, the defraud clause is broader and covers agreements to inter-

fere with or to obstruct government's lawful functions." *United States v. Bilzerian,* 926 F.2d 1285, 1301 (2d Cir.1991); *see also United States v. Nersesian,* 824 F.2d 1294, 1313 (2d Cir.1987).

Counts One and Four each charge a separate conspiracy under the defraud clause and the offense clause of § 371, respectively. Count One charges that, from in or about June 1997 through in or about April 2002, defendants Stewart, Sattar, and Yousry, together with Sheikh Abdel Rahman, Taha, and others, conspired to defraud the United States by obstructing the administration and enforcement of the SAMs imposed on Sheikh Abdel Rahman, in violation of § 371. Count Four charges that, from in or about September 1999 through in or about April 2002, Stewart, Yousry, and others conspired to commit a violation of 18 U.S.C. § 2339A by providing material support to the conspiracy alleged in Count Two, in violation of 18 U.S.C. § 371.

The conspiracies charged in Counts One and Four are not multiplicitous on the face of those counts. They require proof of separate elements, because as explained above, § 371 proscribes two distinct types of conspiracies. *See Bilzerian,* 926 F.2d at 1301–02 (upholding conviction of defendant on two conspiracy charges under defraud clause and offense clause of § 371). Moreover, the conspiracies in Counts One and Four allege separate agreements, with different objectives, starting points, and combinations of conspirators. The conspiracy charged in Count One is alleged to have begun in or about June 1997 with the objective of defrauding the United States by interfering with the administration and enforcement of the SAMs, and its alleged members included Sattar, Stewart, Yousry, Sheikh Abdel Rahman, Taha, and others. The conspiracy charged in Count Four is alleged to have begun in or about September 1999 with the objective of providing material support and resources, and con-

cealing the nature, source, and location of such material support and resources, knowing that it was to be used in preparation for, or in carrying out, the violation of 18 U.S.C. § 956 charged in Count Two. While there is some overlap of the alleged overt acts done in furtherance of the two alleged conspiracies, the proof of the two conspiracies would not necessarily be co-extensive. It would be possible, for example, for a reasonable jury to find a violation of Count One without finding a violation of Count Four. *See Macchia,* 35 F.3d at 668 (noting, in context of successive prosecutions, that while "[a]t a certain level of generality ... [two conspiracies might] overlap with respect to a number of characteristics, including time frame, geographic locale, participants, and criminal objective," there might still exist "sufficient distinctions between the schemes charged" that they do not constitute a single offense).

Because Counts One and Four facially charge two separate conspiracies, Stewart's motion to dismiss these counts as multiplicitous is denied without prejudice to renewal at the close of the evidence. *See United States v. Bin Laden,* 91 F.Supp.2d 600, 614 n. 26 (S.D.N.Y.2000) ("In some cases, whether an aggregate of acts constitute a single course of conduct and therefore a single offense, or more than one, may not be capable of ascertainment merely from the bare allegations of an information and may have to await the trial of the facts." (internal quotation marks omitted)).

## IV

■ As she did in challenging several of the charges in the original indictment, Stewart contends that some of the current charges against her—specifically, Counts One, Six, and Seven of the S1 Indictment—should be dismissed based on the

unconstitutionality of the SAMs or the attorney affirmation requirement. Count One is similar to Count Four of the original indictment and charges a scheme to defraud the United States, in violation of 18 U.S.C. § 371, by obstructing the administration and enforcement of the SAMs imposed on Sheikh Abdel Rahman. Count Six is the same as Count Five in the original indictment and charges a violation of 18 U.S.C. § 1001 in connection with Stewart's submission of the allegedly false May 2000 attorney affirmation in which she agreed to abide by the SAMs. The S1 Indictment adds Count Seven, which charges another violation of 18 U.S.C. § 1001 in connection with Stewart's submission of another allegedly false attorney affirmation in May 2001.

In denying Stewart's previous motion to dismiss the original indictment on these grounds, the Court held that, under *Dennis v. United States*, 384 U.S. 855, 86 S.Ct. 1840, 16 L.Ed.2d 973 (1966) and its progeny, "Stewart cannot defeat the charges against her by attacking the legality or constitutionality of the statute or requirement that prompted her alleged deceit." *Sattar*, 272 F.Supp.2d at 370. As the Supreme Court explained in *Bryson v. United States*, 396 U.S. 64, 90 S.Ct. 355, 24 L.Ed.2d 264 (1969):

> After *Dennis* it cannot be thought that as a general principle of our law a citizen has a privilege to answer fraudulently a question that the Government should not have asked. Our legal system provides methods for challenging the Government's right to ask questions—lying is not one of them. A citizen may decline to answer the question, or answer it honestly, but he cannot with impunity knowingly and wilfully answer with a falsehood.

*Id.* at 72, 90 S.Ct. 355 (footnote omitted). Nothing about the charges in the S1 Indictment change the Court's previous conclusion that *Dennis* and its progeny foreclose Stewart's attempt to challenge the validity and constitutionality of the SAMs and attorney affirmations.

Stewart contends that the *Dennis* line of cases does not apply to lawyers. To support this contention, Stewart cites several cases in which lawyers were permitted to challenge the validity of local court rules that the lawyers had allegedly violated. *See In re Oliver*, 452 F.2d 111 (7th Cir. 1971); *Gamble v. Pope & Talbot, Inc.*, 307 F.2d 729 (3d Cir.1962), *overruled by, Eash v. Riggins Trucking Inc.*, 757 F.2d 557 (3d Cir.1985); *In re Morrissey*, 996 F.Supp. 530 (E.D.Va.1998). Stewart contends that she stands in the same position as the lawyers in those cases, because the attorney affirmations, she claims, are analogous to court rules governing attorney conduct. She maintains that, in accordance with these cases she should be permitted, as a defense, to challenge the validity and constitutionality of the SAMs and the attorney affirmations as well as the regulations under which they were promulgated.

The cases that Stewart cites do not support her argument. The cases do not carve out a "lawyer's exception" to the *Dennis* line of cases. In fact, the cases do not implicate or even discuss *Dennis*. Rather, they discuss other grounds on which the lawyers might have been foreclosed from challenging the validity of the court rules they had allegedly violated. *See Oliver*, 452 F.2d at 113 (holding that collateral bar rule of *Walker v. Birmingham*, 388 U.S. 307, 87 S.Ct. 1824, 18 L.Ed.2d 1210 (1967), that applies to injunctions does not apply to challenges of local court rules); *Morrissey*, 996 F.Supp. at 535–36 (holding that attorney had not waived right to challenge constitutionality of local court rule when he agreed to abide by rule upon admission to practice before court). The lawyers in those cases were

**310**

not charged with having conspired to defraud the Government or with giving false statements to the Government, and thus the cases did not confront the issue that arises under *Dennis* and its progeny. In this case, Stewart is alleged to have conspired to defraud the Government and with having submitted knowingly false affirmations stating that she would abide by the SAMs imposed on Sheikh Abdel Rahman. That alleged conduct brings her within the ambit of *Dennis* and forecloses any attack, as part of her defense, on the validity and constitutionality of the SAMs or the attorney affirmations. *See Sattar,* 272 F.Supp.2d at 372–73. There is no lawyer exception to *Dennis* and no basis to create one. There is no reason that lawyers should be given more rights to challenge their prosecutions for alleged deceit against the Government than those afforded to all other defendants charged with similar crimes.

Stewart also claims that she was openly defying the requirements in order to test their validity. This argument is without merit, and as the Court observed in deciding the motions directed at the original indictment, Stewart had ample opportuni-

ties to challenge the SAMs and the attorney affirmations within the legal system. *See Sattar,* 272 F.Supp.2d at 372.

 Stewart's motions to dismiss Counts One, Six, and Seven are denied.[17]

V

 Sattar contends that Count Two improperly joins two or more distinct offenses and moves to dismiss that count as duplicitous. He maintains that Count Two charges at least six distinct conspiracies.

 "An indictment is impermissibly duplicitous where: (1) it combines two or more distinct crimes into one count in contravention of Fed.R.Crim.P. 8(a)'s requirement that there be a separate count for each offense, and (2) the defendant is prejudiced thereby." *United States v. Sturdivant,* 244 F.3d 71, 75 (2d Cir.2001) (internal citation omitted); *see also United States v. Margiotta,* 646 F.2d 729, 733 (2d Cir.1981); *Sattar,* 272 F.Supp.2d at 381. Count Two alleges that defendant Sattar, Sheikh Abdel Rahman, and Taha, together with others known and unknown, "unlawfully, willfully, and knowingly combined, conspired, confederated, and agreed to-

17. Stewart also contends that Count One should be dismissed because it fails to state an offense. This follows, she argues, from the fact that Count One "relies on" her signing of the attorney affirmations, even though "there is no provision in the regulatory scheme for such affirmations." (Stewart Mem. at 58.) To the extent this argument is not foreclosed by *Dennis* and its progeny, it is without merit. Count One charges a conspiracy to defraud the United States, and more particularly to obstruct the legitimate functions of the Department of Justice and the Bureau of Prisons in the administration and enforcement of the SAMs imposed on Sheikh Abdel Rahman. Stewart's signing of the affirmations is simply not an element of the offense charged in Count One. Therefore, Stewart's motion to dismiss Count One on the grounds that it does not state an offense is denied.

Stewart also argues that Count One should be dismissed because it is impermissibly vague "and thus violates her Fifth Amendment right to be tried only on charges returned by a grand jury and not on charges later determined by the government to be used as grounds for trial and conviction." (Stewart Mem. at 60.) The argument is without merit. "What is required is only that an indictment charging a defraud clause conspiracy set forth with precision the essential nature of the alleged fraud." *United States v. Helmsley,* 941 F.2d 71, 90–91 (2d Cir.1991) (internal quotation marks and citation omitted). Count One satisfies this requirement because it charges a conspiracy to defraud the United States by obstructing the administration and enforcement of the SAMs imposed on Sheikh Abdel Rahman. Stewart's motion to dismiss Count One on these grounds is denied.

gether and with each other to murder and kidnap persons in a foreign country." (S1 Ind. ¶ 32.) Count Two thus alleges a single conspiracy. Moreover, "[w]hether the Government has proven the existence of the conspiracy charged in the indictment and each defendant's membership in it, or instead, has proven several independent conspiracies is a question for a properly instructed jury." *United States v. Trippe*, 171 F.Supp.2d 230, 238 (S.D.N.Y.2001) (quoting *United States v. Johansen*, 56 F.3d 347, 350 (2d Cir.1995)); *see also Sattar*, 272 F.Supp.2d at 381–82. The motion to dismiss Count Two as duplicitous is therefore denied.

## VI

■ Stewart and Sattar move to dismiss several counts in the S1 Indictment on the grounds that the charges are the product of vindictive prosecution. Stewart moves to dismiss Counts Four, Five, and Seven, and Sattar moves to dismiss Count Two. They contend, among other things, that the new charges "up the ante" by exposing them to greater potential sentences, that the charges could have been brought in the original indictment but were not, and that the charges were initiated to punish the defendants for successfully challenging the charges under 18 U.S.C. § 2339B in the original indictment.

■ The Attorney General and the United States Attorneys retain broad discretion to enforce federal criminal laws. *United States v. Armstrong*, 517 U.S. 456, 464, 116 S.Ct. 1480, 134 L.Ed.2d 687 (1996). Their prosecutorial decisions are supported by a presumption of regularity, and, absent clear evidence to the contrary, courts presume that the prosecutorial decisions are proper. *Id.* However, the decision to prosecute violates due process when the prosecution is brought in retaliation for the defendant's exercise of legal rights. *See Bordenkircher v. Hayes*, 434 U.S. 357, 363, 98 S.Ct. 663, 54 L.Ed.2d 604

(1978); *Blackledge v. Perry*, 417 U.S. 21, 27, 94 S.Ct. 2098, 40 L.Ed.2d 628 (1974); *United States v. White*, 972 F.2d 16, 19 (2d Cir.1992). "Accordingly, an indictment will be dismissed if there is a finding of actual vindictiveness, or if there is a presumption of vindictiveness that has not been rebutted by objective evidence justifying the prosecutor's action." *United States v. Johnson*, 171 F.3d 139, 140 (2d Cir.1999) (per curiam).

■ To avoid even the appearance of vindictiveness in prosecutorial decisions, a rebuttable presumption of vindictiveness arises when the circumstances of a case create a "realistic likelihood" of vindictiveness. *United States v. King*, 126 F.3d 394, 397 (2d Cir.1997); *Johnson*, 171 F.3d at 141. The court must examine the "totality of the objective circumstances" to determine whether it is likely that the superseding indictment was sought in retaliation for the defendant's exercise of his legal rights. *King*, 126 F.3d at 398. For a presumption of vindictiveness to arise, however, the circumstances must present a realistic likelihood of vindictiveness that would be "applicable in all cases." *United States v. Goodwin*, 457 U.S. 368, 381, 102 S.Ct. 2485, 73 L.Ed.2d 74 (1982); *United States v. Sanders*, 211 F.3d 711, 717 (2d Cir.2000). The Court of Appeals for the Second Circuit "has consistently adhered to the principle that the presumption of prosecutorial vindictiveness does not exist in a pretrial setting," *Paradise v. CCI Warden*, 136 F.3d 331, 335 (2d Cir.1998); *White*, 972 F.2d at 19, although sometimes the Court of Appeals has described this principle as "[a] presumption of vindictiveness generally does not arise in a pretrial setting." *Sanders*, 211 F.3d at 717; *United States v. Koh*, 199 F.3d 632, 639 (2d Cir.1999).

■ This case is, of course, still in a pretrial setting, and a presumption of vindictiveness should not arise. Nonetheless,

even considering the totality of the objective circumstances of the case, there is no realistic likelihood of vindictiveness on the part of the prosecutors, and thus no presumption of vindictiveness arises. Both Stewart and Sattar contend that the presumption of vindictiveness should apply because the Government allegedly brought new charges against them in the S1 Indictment as a penalty for having successfully challenged certain charges in the original indictment. However, the Supreme Court has explained that defendants routinely file pretrial motions to challenge, among other things, "the sufficiency and form of an indictment," and that "[i]t is unrealistic to assume that a prosecutor's probable response to such motions is to seek to penalize and to deter." *Goodwin*, 457 U.S. at 381, 102 S.Ct. 2485. A defendant's invocation of procedural rights, as well as a prosecutor's broad discretion to determine the proper extent of a prosecution, are each "an integral part of the adversary process in which our criminal justice system operates." *Id.* at 381, 102 S.Ct. 2485. A presumption of vindictiveness does not arise where, as here, the defendants "invoke procedural rights that inevitably impose some 'burden' on the prosecutor," and where the prosecutors continue, in response to that burden, to exercise their broad discretion to "determine the extent of the societal interest in prosecution." *Id.* at 381–82, 102 S.Ct. 2485.

The defendants also contend that the presumption of vindictiveness should arise because the new charges could have been brought in the original indictment. The Court of Appeals has already rejected this argument, because to permit the presumption to arise in such circumstances "would encourage prosecutors to overcharge defendants, by charging both a greater number of crimes and the most severe crimes supported by the evidence[,] . . . a result we do not wish to promote." *Paradise*, 136 F.3d at 336 (internal quotation marks

and citation omitted). Similarly, the Supreme Court in *Goodwin* noted that "[t]o presume that every case is complete at the time an initial charge is filed . . . is to presume that every prosecutor is infallible—an assumption that would ignore the practical restraints imposed by often limited prosecutorial resources." *Goodwin*, 457 U.S. at 382 n. 14, 102 S.Ct. 2485. Therefore, "the validity of a pretrial charging decision must be measured against the broad discretion held by the prosecutor to select the charges against the accused." *Paradise*, 136 F.3d at 336 (internal quotation marks and citation omitted).

The Court of Appeals has also rejected the defendants' argument that by "upping the ante" in terms of the defendants' potential sentences, new charges raise a presumption of vindictiveness. In *Paradise*, the Court of Appeals concluded that the presumption of vindictiveness did not arise where prosecutors charged the defendant with a capital offense following his successful motion to dismiss a non-capital offense on statute of limitations grounds. *See Paradise*, 136 F.3d at 336. As the Court of Appeals noted, the "punitive motivation" underlying a prosecutorial decision does not represent a constitution violation where the decision is made "to punish not for the right exercised, but for the crime committed." *Id.* Because the totality of the objective circumstances in this case do not present a realistic likelihood of vindictiveness, the presumption of vindictiveness does not arise, and the burden does not shift to the Government to justify its prosecutorial decisions.

Sattar's reliance on *Lane v. Lord*, 815 F.2d 876 (2d Cir.1987), is misplaced. *Lane* addressed the "narrow issue" of whether a presumption of vindictiveness arises where, following a mistrial, a prosecutor files a superseding indictment that adds a criminal charge that does not expose the defendant to a higher maximum criminal

penalty. *Lane,* 815 F.2d at 877. The Court of Appeals noted that in similar cases it had "proceeded with caution" in devising rules governing the presumption of vindictiveness in the context of a mistrial, because that setting "falls in between the Supreme Court's pretrial/post-conviction dichotomy." *Id.* at 878. The Court of Appeals held that no presumption would arise under the facts presented in *Lane,* because "[a]t least in the mistrial context, we believe that a threat of greater punishment is required to justify a 'realistic' apprehension of retaliatory motive on the part of the prosecution." *Id.* at 879. *Lane* thus stands for the proposition that in order for a presumption of vindictiveness to arise following a mistrial, it is "required"—but not necessarily sufficient—that the superseding indictment increase the potential punishment faced by the defendant. While in this case the potential punishment faced by defendant Sattar has increased under the S1 Indictment, the case is not in the mistrial setting. This case plainly falls on the "pretrial" side of the dichotomy noted in *Lane.* Nor is there any reason to treat this case's current setting as akin to the mistrial context, given the Supreme Court's observations in *Goodwin* that challenges to the sufficiency of indictments are expected as a matter of course in the pretrial setting, and given the Court of Appeals' explicit hesitation in *Lane* to apply the "inflexible" presumption of vindictiveness even in a mistrial context. This case is still in a pretrial setting, and considering the increased burden of proof that the Government will face at trial, among other factors, the fact that the S1 Indictment exposes Sattar to a potentially higher sentence does not, under the totality of the objective circumstances in this case, present a realistic likelihood of vindictiveness.

■ Therefore, to succeed on the motions to dismiss on the grounds of vindictiveness, the defendants must establish the actual vindictiveness of the prosecutors. To establish a prosecutor's actual vindictiveness, a defendant must "prove objectively that the prosecutor's charging decision was a direct and unjustifiable penalty that resulted solely from the defendant's exercise of a protected right." *Sanders,* 211 F.3d at 716–17; *see also Goodwin,* 457 U.S. at 384, 102 S.Ct. 2485 (proving actual vindictiveness requires that defendant "prove objectively that the prosecutor's charging decision was motivated by a desire to punish him for doing something that the law plainly allowed him to do"). In other words, a defendant must show that "(1) the prosecutor harbored genuine animus toward the defendant, or was prevailed upon to bring the charges by another with animus such that the prosecutor could be considered a 'stalking horse,' and (2) [the defendant] would not have been prosecuted except for the animus." *Koh,* 199 F.3d at 640 (internal quotation marks and citation omitted). "A finding of actual vindictiveness requires 'direct' evidence, such as evidence of a statement by the prosecutor, which is available 'only in a rare case.'" *Johnson,* 171 F.3d at 140–41 (quoting *Goodwin,* 457 U.S. at 380–81 & nn. 12–13, 102 S.Ct. 2485).

The defendants have not shown any evidence of actual vindictiveness on the part of the prosecutors in this case. The defendants contend that the actual vindictiveness of the prosecutors is shown by the fact that the prosecutors could have brought these charges originally but did not do so, that the new charges increase the potential sentences faced by the defendants, and that they were brought only to penalize the defendants' partially successful challenge to the original indictment.[18]

---

18. Defendant Stewart also contends that the prosecutors' vindictiveness is established by

the fact that the reputation of the United States Attorney's Office is on the line in this

As explained above, these circumstances do not even present a realistic likelihood of vindictiveness, much less direct evidence of actual vindictiveness. As the Court of Appeals has explained, "[t]he original counts of an indictment are not unalterably set in concrete," and "[t]here is nothing vindictive about the fact that [the Government] substituted a proper felony count for one selected in error." *United States v. Eichman*, 957 F.2d 45, 47 (2d Cir.1992). Indeed, as the discussion of the motion to dismiss Counts Four and Five indicates, some of the new charges in this case responded directly to the reasons that the Court had found Counts One and Two of the original indictment to be unconstitutionally vague as applied. Rather than evidencing actual vindictiveness, the S1 Indictment reflected prosecutorial decisions, like those in *Paradise* and *Eichman*, to bring charges that allegedly charged proper crimes. And, as a result of the defendants' original motions to dismiss and the prosecutors' subsequent decisions to bring revised charges, the elements of some of the offenses that the Government will be required to prove at trial now include a heightened scienter requirement. There is no evidence at all that the prosecutors' decision to seek the S1 Indictment was motivated in the slightest by vindictiveness.

 In the alternative, Stewart and Sattar seek discovery or an evidentiary hearing on their claims of vindictive prosecution. To obtain discovery on a claim of vindictive prosecution, a defendant must provide "some evidence tending to show the existence of the essential elements of the defense." *Sanders*, 211 F.3d at 717. This standard is "rigorous" and is "a significant barrier to the litigation of insub-

stantial claims." *Id.* (internal quotation marks and citation omitted). The defendants have submitted no evidence that tends to show the existence of a vindictive prosecution claim, and they are not entitled to discovery. For the same reason, the defendants are not entitled to an evidentiary hearing, because they have "placed no controlling facts in dispute to warrant a hearing." *White*, 972 F.2d at 20.

Stewart's motion to dismiss Counts Four, Five, and Seven, and Sattar's motion to dismiss Count Two, on the grounds of vindictive prosecution are denied. Their motions for discovery and an evidentiary hearing are also denied.

## VII

 Defendant Stewart moves to disqualify Assistant United States Attorneys Christopher J. Morvillo and Robin L. Baker on the grounds that they allegedly ought to be witnesses. Stewart contends that the Government has taken different, and contradictory, views of the facts of this case in the original indictment and the S1 Indictment, and that AUSA Morvillo and AUSA Baker ought to be called as witnesses to explain the Government's allegedly shifting and contradictory view of the facts. Stewart maintains that the Government's initial allegations in the original indictment that she provided herself as "personnel" to the Islamic Group, in violation of 18 U.S.C. § 2339B, is factually inconsistent with the Government's present allegations that she conspired to provide and provided Sheikh Abdel Rahman as "personnel" to the Count Two conspiracy, in violation of 18 U.S.C. § 2339A and 18 U.S.C. § 371. Stewart notes that the Gov-

---

case and that the prosecutors allegedly failed to convince the Solicitor General to seek an appeal of the Court's dismissal of the original charges under 18 U.S.C. § 2339B. This is

sheer speculation that does not present either a realistic likelihood of vindictiveness or direct evidence of actual vindictiveness.

ernment previously acknowledged that its statements in court and in its briefs could be taken as the equivalent of a bill of particulars. *See Sattar,* 272 F.Supp.2d at 361 ("The Government has painted a picture in the Indictment, at oral argument, and in its briefs, which the Government has said can be taken as a bill of particulars, of a communications pipeline staffed by the defendants that enabled Sheikh Abdel Rahman and other IG leaders around the world to communicate with one another.")

■■■ "A defendant who wishes to call a prosecutor as a witness must demonstrate a compelling and legitimate reason to do so." *United States v. Regan,* 103 F.3d 1072, 1083 (2d Cir.1997) (citing *United States v. Schwartzbaum,* 527 F.2d 249, 253 (2d Cir.1975)). To support her argument that AUSA Morvillo and AUSA Baker ought to be called as witnesses, Stewart relies on *United States v. McKeon,* 738 F.2d 26 (2d Cir.1984), where the Court of Appeals affirmed the district court's finding that a defense attorney's statement of fact in a jury argument in a prior trial of the same case was admissible against the defendant at a later trial where the defense asserted an inconsistent position. *See id.* at 33–34. The Court of Appeals also affirmed the district court's conclusion that this finding required that the defense attorney be disqualified as the defendant's trial counsel. *See id.* at 35. In *United States v. GAF Corp.,* 928 F.2d 1253 (2d Cir.1991), the Court of Appeals, relying in large part on *McKeon,* held that the Government's prior bill of particulars in the case, which was inconsistent with the Government's amended bill of particulars in a later trial of the same case, could be admitted into evidence. *Id.* at 1262. The Court of Appeals observed that "if the government chooses to change its strategy at successive trials, and contradict its previous theories of the case and version of the historical facts, the jury is entitled to

be aware of what the government has previously claimed, and accord whatever weight it deems appropriate to such information." *Id.* The Court of Appeals in *GAF Corp.* did not address the issue of disqualification, because the sole question before it was whether the prior bill of particulars was admissible into evidence.

These cases do not support Stewart's motion to disqualify AUSAs Morvillo and Baker. The cases concern a party's inconsistent factual contentions in a case and whether a party's earlier version of the facts is admissible against the party at a later stage of the case. *See McKeon,* 738 F.2d at 33 (noting that before permitting evidentiary use of an attorney's statements in a prior jury argument as admissions of a party opponent, "the district court must be satisfied that the prior argument involves an assertion of fact inconsistent with similar assertions in a subsequent trial"); *GAF Corp.,* 928 F.2d at 1262 (concluding that Government's prior bill of particulars was admissible where Government subsequently chose to "contradict its previous theories of the case and version of the historical facts"). Moreover, the Court of Appeals made it plain in *McKeon* that the "inconsistency ... should be clear and of a quality which obviates any need for the trier of fact to explore other events at the prior trial." *McKeon,* 738 F.2d at 33. In this case, the alleged contradictions and inconsistencies that Stewart claims to discern in the Government's view of her conduct do not concern the Government's factual contentions or its version of the historical facts.

In the original indictment and the S1 Indictment, and in the briefs concerning each, the Government has not changed its allegations of what Stewart did. In both indictments the Government alleges that Stewart participated in what can be characterized as "a communications pipeline

staffed by the defendants that enabled Sheikh Abdel Rahman and other [Islamic Group] leaders around the world to communicate with one another." *Sattar,* 272 F.Supp.2d at 361. In the S1 Indictment the Government has changed the statutory charges which form the basis for the allegations that Stewart's conduct was a violation of federal criminal law. But the Government has not changed its view of the facts and events charged. As explained above, the Government's change in legal theories falls comfortably within its broad discretion to make prosecutorial decisions in the pretrial context. *See, e.g., Eichman,* 957 F.2d at 47 ("The original counts of an indictment are not unalterably set in concrete.... There is nothing vindictive about the fact that [the Government] substituted a proper felony count for one selected in error.").

In any event, even if any of the prior statements by the Government about Stewart could overcome the high hurdles that the Court of Appeals erected in *McKeon* against admissibility, and Stewart has not shown there are any such statements, there is no showing that testimony of any witnesses would be required for the admission of such statements. Moreover, the Court of Appeals has made it clear that the trial court has broad discretion to protect against the disqualification of trial counsel by adopting procedures to assure that the facts are placed before the jury without identifying trial counsel. *See Purgess v. Sharrock,* 33 F.3d 134, 144 (2d Cir.1994); *United States v. Bin Laden,* 91 F.Supp.2d 600, 624–25 (S.D.N.Y.2000).

There is no basis for the disqualification of any of the Government attorneys in this case.[19]

## VIII

■■■ Stewart also moves for a severance pursuant to Federal Rules of Criminal Procedure 8(b) and 14. The Court previously denied the motion when it was made in connection with the original indictment. *See Sattar,* 272 F.Supp.2d at 381. The arguments fare no better when directed against the S1 Indictment.

■■■ Under Rule 8(b), joinder of defendants is proper if "they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses." Fed.R.Crim.P. 8(b). "Thus, multiple defendants may be charged and tried for multiple offenses only if the offenses are related pursuant to the test set forth in Rule 8(b), that is, only if the charged acts are part of a 'series of acts or transactions constituting ... offenses.'" *United States v. Turoff,* 853 F.2d 1037, 1043 (2d Cir.1988). For joinder under Rule 8(b) to be permissible, the acts in which the defendants are alleged to have participated "must be unified by some substantial identity of facts or participants or arise out of a common plan or scheme." *United States v. Attanasio,* 870 F.2d 809, 815 (2d Cir. 1989) (internal quotation marks and citations omitted); *see also United States v. Reinhold,* 994 F.Supp. 194, 197 (S.D.N.Y. 1998); *United States v. Lech,* 161 F.R.D. 255, 256 (S.D.N.Y.1995). However, two separate transactions do not constitute a "series" within the meaning of Rule 8(b) "merely because they are of a similar character or involve one or more common participants." *Lech,* 161 F.R.D. at 256 (internal citation omitted); *see Sattar,* 272 F.Supp.2d at 378.

---

**19.** In her reply memorandum, defendant Stewart expanded her application to include the entire United States Attorney's Office for the Southern District of New York, or at least to include Assistant United States Attorney Anthony S. Barkow. There is no basis for this alleged disqualification.

On the face of the S1 Indictment, as with the original indictment, the defendants are properly joined because there is both "substantial identity of facts or participants" and the allegations in the Indictment "arise out of a common plan or scheme." *Attanasio,* 870 F.2d at 815; *see also Sattar,* 272 F.Supp.2d at 379. The allegations in the S1 Indictment have not changed in a way that would alter the analysis under Rule 8(b). For the reasons the Court explained in the prior decision, the conduct alleged in the S1 Indictment demonstrates a substantial identity of facts and clearly arises out of a common plan or scheme. The allegations in the current S1 Indictment are as "inextricably related" as the Court found the allegations to be in the original indictment. *See Sattar,* 272 F.Supp.2d at 379.

▮ Nor is there a basis to grant Stewart a severance pursuant to Rule 14 of the Federal Rules of Criminal Procedure. Rule 14 provides, in relevant part, that "[i]f the joinder of offenses or defendants in an indictment, an information, or a consolidation for trial appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires." The Supreme Court teaches that "a district court should grant a severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro v. United States,* 506 U.S. 534, 539, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993). There is a preference for joint trials in the federal system for defendants who are indicted together. Joint trials promote efficiency and promote the interests of justice, by, among other means, avoiding inconsistent verdicts. *Id.* at 537, 113 S.Ct. 933. Thus, a defendant seeking such a severance "must show that he [will be] so severely prejudiced by the joinder as to [be] denied a fair trial, not that he might have [ ] a better chance for acquittal at a separate trial." *United States v. Torres,* 901 F.2d 205, 230 (2d Cir.1990) (citations and internal quotation marks omitted); *see also Sattar,* 272 F.Supp.2d at 379–80.

Stewart's arguments in support of her severance motion are similar to those she advanced in making the same motion in connection with the original indictment. She contends that there is a risk of prejudicial spillover from evidence that, she contends, is admissible against her co-defendants but not against her, that the jury will be utterly confused in any effort to keep straight which evidence is admissible against each defendant, and that her alleged conduct is substantially and meaningfully different from that of her co-defendants because she is a lawyer. None of these arguments has any merit, and there is nothing about the charges in the S1 Indictment that changes the Court's prior conclusion that Stewart is not entitled to a severance. *See Sattar,* 272 F.Supp.2d at 380–81.

Stewart raises the specter that there may be statements offered by the Government that should be excluded under *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). But the Government reiterated at argument its prior representation that, if it seeks to introduce any statements that are covered by *Bruton,* it will produce in advance a properly redacted version of the statement so that it can be reviewed by defense counsel and the Court to assure that it has been properly redacted. *See Gray v. Maryland,* 523 U.S. 185, 118 S.Ct. 1151, 140 L.Ed.2d 294 (1998) (redaction found insufficient); *Richardson v. Marsh,* 481 U.S. 200, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987) (redaction found sufficient); *see also* Tr. 36–37. There

is no reason to believe that any evidentiary issues in this case warrant a severance.

Stewart's motion for a severance is denied.

## IX

 Stewart and Sattar both seek a bill of particulars. The decision whether to grant a bill of particulars pursuant to Federal Rule of Criminal Procedure 7(f) rests with the sound discretion of the district court. See *United States v. Cephas*, 937 F.2d 816, 823 (2d Cir.1991); *United States v. Panza*, 750 F.2d 1141 (2d Cir. 1984); *United States v. Strawberry*, 892 F.Supp. 519, 526 (S.D.N.Y.1995). The purpose of a bill of particulars is to enable a defendant "to prepare for trial, to prevent surprise, and to interpose a plea of double jeopardy should he be prosecuted a second time for the same offense." *United States v. Bortnovsky*, 820 F.2d 572, 574 (2d Cir. 1987). A bill of particulars is required "only when the charges of the indictment are so general that they do not advise the defendant of the specific acts of which he is accused." *United States v. Torres*, 901 F.2d 205, 234 (2d Cir.1990) (citation omitted); *see also Cephas*, 937 F.2d at 823; *Panza*, 750 F.2d at 1148. The Government may not be compelled to provide a bill of particulars disclosing the manner in which it will attempt to prove the charges, the precise manner in which the defendant committed the crimes charged, or a preview of the Government's evidence or legal theories. See *United States v. Mitlof*, 165 F.Supp.2d 558, 569 (S.D.N.Y.2001) (collecting cases). "Generally, if the information sought by the defendant is provided in the indictment or in some acceptable alternate form, no bill of particulars is required." *Bortnovsky*, 820 F.2d at 574; *see United States v. Barnes*, 158 F.3d 662, 665 (2d Cir.1998). Moreover, "demands for particular information with respect to where, when, and with whom the Government will charge the defendant with conspiring are

routinely denied." *United States v. Trippe*, 171 F.Supp.2d 230, 240 (S.D.N.Y. 2001) (collecting cases); *see also United States v. Ojeikere*, 299 F.Supp.2d 254, 260–61 (S.D.N.Y.2004).

Stewart seeks a sweeping bill of particulars to which she is not entitled. The detailed S1 Indictment, which includes a significant number of specific factual allegations, together with the ongoing and voluminous discovery in this case provides Stewart with adequate notice of the charges against her so that she can prepare for trial, avoid surprise, and interpose a plea of double jeopardy if warranted in any subsequent prosecution. Her request for a bill of particulars is "an impermissible attempt to compel the Government to provide the evidentiary details of its case." *United States v. Biaggi*, 675 F.Supp. 790, 810 (S.D.N.Y.1987). Stewart's request for a bill of particulars is denied.

 Sattar seeks a more tailored bill of particulars on Count Two. He requests that the Government be required to state: "1: The names and identities of any persons who were the objects of the conspiracy alleged in this count. 2. The names and identities of any persons murdered or kidnapped in a foreign country in connection with the conspiracy alleged in this count. 3. The dates and places of any acts of murder or kidnapping or attempts to murder or kidnap as alleged in this count." (Sattar Mem. at 20.) However, he is not entitled to the bill of particulars he seeks. As explained above, the Government is not required, in proving the conspiracy alleged in Count Two, to prove that any specific persons were killed or kidnapped. Moreover, the Government represented at the argument of the motions that it does not intend to prove at trial that there were any specific identifiable victims of the conspiracy alleged in Count Two. (Tr. 39.) The Government also conceded that the repre-

sentations in its briefs and at argument could be taken as a bill of particulars. (Tr. 34–35.) These representations, together with the allegations in the S1 Indictment and the voluminous discovery in this case, give defendant Sattar adequate notice of the charges against him in Count Two so that he can prepare for trial, avoid surprise, and interpose a plea of double jeopardy when necessary. This is not a case where the allegations in the indictment are so general that a bill of particulars is required to permit defendant Sattar to prepare a defense and avoid surprise at trial. *See Bin Laden,* 92 F.Supp.2d at 236, 239 & n. 24 (requiring limited bill of particulars where there were fifteen named defendants, 267 discrete criminal offenses, and five conspiracies, and where alleged overt acts included "broad categories of conduct" and "terms as general as engaging in 'travel' and conducting 'business,'" but denying particulars with respect to other overt acts such as "recruiting United States citizens," "attacking U.S. military personnel in Somalia," and "transporting weapons"). Sattar's application for a bill of particulars is denied.

### X

██ Sattar seeks pretrial access to Mohammed Abdel Rahman, whom Sattar believes to be in the custody of the United States at the United States Naval Base at Guantanamo Bay in Cuba, and to compel his testimony. The Government represents that, if compulsory process is sought for Mohammed Abdel Rahman, then for national security reasons, it will neither confirm nor deny whether it has custody of Mohammed Abdel Rahman. For the purposes of this motion, whether the Government has him in custody or not is irrelevant, because Sattar has not established that he has a Sixth Amendment right to compulsory process for Mohammed Abdel Rahman.

██ By its terms, the Sixth Amendment gives the defendant in a criminal trial the right "to have compulsory process for obtaining witnesses in his favor." U.S. Const. amend. VI. However, the Sixth Amendment does not confer on the defendant an absolute right to compel the presence of any witnesses the defendant may choose. *United States v. Scopo,* 861 F.2d 339, 345 (2d Cir.1988). Rather, the defendant in a criminal trial is entitled to call witnesses "in his favor," and thus to establish a violation of the Sixth Amendment right to compulsory process, the defendant "must at least make some plausible showing of how their testimony would have been both material and favorable to his defense." *United States v. Valenzuela–Bernal,* 458 U.S. 858, 867, 102 S.Ct. 3440, 73 L.Ed.2d 1193 (1982); *Scopo,* 861 F.2d at 345; *United States v. Ginsberg,* 758 F.2d 823, 831 (2d Cir.1985). "Because ... the explanation of materiality is testimonial in nature ... it should be verified by oath or affirmation of either the defendant or his attorney." *Valenzuela–Bernal,* 458 U.S. at 873, 102 S.Ct. 3440.

In this case, Sattar has presented only the unsworn representations of his attorney to support his claim that Mohammed Abdel Rahman can provide testimony favorable to his defense. Even if sworn, those allegations would be insufficient. In the moving papers, counsel for Sattar asserts that the allegations in the S1 Indictment and the discovery material together demonstrate that it is "more than plausible" that Mohammed Abdel Rahman's testimony would be material and favorable to the defense. (Sattar Mem. at 21.) The fact that Mohammed Abdel Rahman's name appears in the S1 Indictment provides no basis to conclude that his testimony would be favorable to Sattar's defense. Indeed, the references to Mohammed Abdel Rahman in the S1 Indictment are not helpful to Sattar and do not suggest that

his testimony would be favorable to Sattar. Sattar's counsel also does not explain how the discovery material disclosed in this case would support his argument that Mohammed Abdel Rahman's testimony would be favorable. At the argument, Sattar's counsel explained only that he wanted to speak to Mohammed Abdel Rahman. (Tr. 47–48.) In his memorandum, Sattar's counsel states in conclusory fashion that the testimony "would be favorable and corroborate Sattar's defense, that he had no part in this alleged conspiracy." (Sattar Mem. at 22.) These assertions are insufficient to establish a Sixth Amendment right to compulsory process for Mohammed Abdel Rahman. *See Ginsberg,* 758 F.2d at 831 (holding that defendant cannot "simply posit the testimony most helpful to him that the [missing witness] could provide," but rather must "show some reasonable basis to believe that the desired testimony would be both helpful and material to his defense").

Sattar's motion for pretrial access to Mohammed Abdel Rahman and to compel his testimony is denied.[20]

### XI

Stewart moves to strike various aspects of the S1 Indictment as surplusage.

■■■■ "Although the Federal Rules of Criminal Procedure grant the Court authority to strike surplusage from an indictment, *see* Fed.R.Crim.P. 7(d), it has long been the policy of courts within the Southern District to refrain from tampering with indictments." *Bin Laden,* 91 F.Supp.2d at 621 (internal quotation marks, alterations, and citation omitted). "Motions to strike surplusage from an indictment will be granted only where the challenged allegations are not relevant to the crime charged and are inflammatory and prejudicial." *United States v. Scarpa,*

913 F.2d 993, 1013 (2d Cir.1990) (internal quotation marks omitted). " '[I]f evidence of the allegation is admissible and relevant to the charge, then regardless of how prejudicial the language is, it may not be stricken.' " *Id.* (quoting *United States v. DePalma,* 461 F.Supp. 778, 797 (S.D.N.Y. 1978) (alteration in the original)); *see also United States v. Rittweger,* 259 F.Supp.2d 275, 293 (S.D.N.Y.2003) (collecting cases).

Stewart contends that paragraphs 1–27, which serve as an "Introduction," should be stricken from the S1 Indictment. She contends that the use of an introduction violates Federal Rule of Criminal Procedure 7(c)(1), because these paragraphs are not part of any "count" and thus cannot be incorporated by reference in any other count. Stewart does not cite any cases to support this position, and while Rule 7(c)(1) provides that an indictment "need not contain a formal introduction," it does not prohibit a background section. Fed. R.Crim.P. 7(c)(1). Moreover, the Court of Appeals has affirmed that background paragraphs need not be stricken from an indictment where they are relevant to the crimes charged. *See United States v. Langella,* 776 F.2d 1078, 1081 (2d Cir. 1985); *see also United States v. Mulder,* 273 F.3d 91, 95–100 (2d Cir.2001); *United States v. Rahman,* No. S5 93 Cr. 181, 1994 WL 708148, at *1 (S.D.N.Y. Dec. 20, 1994); *United States v. Rahman,* No. S3 93 Cr. 181, 1994 WL 388927, at *5–*6 (S.D.N.Y. July 22, 1994).

■■■ Stewart also moves to strike as irrelevant and prejudicial other parts of the S1 Indictment, including, among many other things, references to "fatwah," "jihad," and variations on the term "terrorism." However, the Court cannot conclude at this stage of the proceedings that any aspect of the S1 Indictment is either

---

**20.** Stewart also joined in this motion but made no additional arguments to support the motion. For the reasons explained above, this motion is also denied.

irrelevant or prejudicial. *See United States v. Al–Arian,* No. 8:03–CR–77–T–30TBM, 2004 WL 516571, at \*25–\*26 (M.D.Fla. Mar.12, 2004) (denying motion to strike words "terrorism," "terrorist," and "terrorist activity" from indictment); *Bin Laden,* 91 F.Supp.2d at 621–22 (denying motion to strike references to "terrorist groups and affiliated terrorist groups"). Stewart "may renew [her] motion after the presentation of the government's case if it fails to offer proof" of the allegations in the S1 Indictment. *See Scarpa,* 913 F.2d at 1011–13. Stewart's motion to strike is denied without prejudice to renewal at the close of the Government's case.

## CONCLUSION

The Court has considered all of the arguments of the parties. To the extent they are not addressed above, they are either moot or without merit. All of the defendants' motions are denied as explained above. The motion challenging Counts One and Four as multiplicitous and the motion to strike surplusage in the S1 Indictment are denied without prejudice to renewal at the close of the Government's case.

**SO ORDERED.**